ESTATE OF HENRY J. JACKSON, DECEASED, EARLENE JACKSON, ADMINISTRATRIX, AND EARLENE JACKSON, SURVIVING SPOUSE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6619-74.     Filed May 17, 1979.

*Joseph H. Blackwell,* for the petitioners.
*John P. Graham,* for the respondent.

IRWIN, *Judge:* Respondent determined a deficiency in petitioner's income tax of $23,951.68 and an addition to tax of $11,975.84 under section 6653(b)[1] for the calendar year 1971. Petitioners concede that there is a deficiency in income tax and an addition to tax due from petitioner, Estate of Henry J. Jackson, deceased, Earlene Jackson, administratrix, as determined in the notice of deficiency without taking into consideration the jeopardy assessment made in April 1974. The only question remaining for our resolution is whether petitioner, Earlene Jackson, is an innocent spouse within the provisions of section 6013(e) and, therefore,

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect during the taxable year in issue.

relieved from any individual liability for the deficiency in income tax.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts, along with attached exhibits, are incorporated herein by this reference.

Petitioner Earlene Jackson, individually and as administratrix of the Estate of Henry J. Jackson, deceased, was a legal resident of Shaker Heights, Ohio, at the time of filing her petition herein. References to petitioner are hereafter solely to Earlene Jackson.

Petitioner and her husband, Henry J. Jackson (hereafter Henry), signed and filed a timely joint Federal income tax return for the taxable year ending December 31, 1971. Said return reported gross income of $81,173, adjusted gross income of $13,983, and taxable income of $10,458. However, the parties agree that taxable income as shown on the return was understated in the amount of $86,291.39.[2]

Prior to October 1971, the Jacksons resided in a house located at East 103d and St. Clair Avenue in Cleveland for a monthly rent of $95. In September of 1971, they purchased a new home at 3677 Gridley in Shaker Heights, Ohio, for $36,500. This house has three floors, all finished, and a two-car garage. Legal title was transferred to them in their joint names on December 9, 1971. They both signed the written offer of purchase and acceptance, dated June 18, 1971, which provided for a deposit of $1,000 and payment in cash of $35,500 at closing. They both also signed the purchase money mortgage on this property for $23,000. Henry paid $13,500 as a downpayment, plus $660 for October and November mortgage payments due by the sellers during occupancy by the purchasers plus $800 for some used household furnishings. After closing, monthly payments of $257 were due under the mortgage.

---

[2]This understatement was determined by reconstructing petitioner's income using a net worth plus expenditures method. This computation showed an increase in total assets from $18,821.81 on 12/31/70 to $110,446.96 on 12/31/71, and an increase in total liabilities from $12,607.49 on 12/31/70 to $37,138.43 on 12/31/71. Thus, petitioner's net worth was determined to have increased by $67,094.21 during the taxable year 1971. An adjustment of $33,180.18 to this increase in net worth was made to take into account income taxes paid, gifts, and income tax refunds. On this basis, respondent determined that petitioner should have reported adjusted gross income of $100,274.39. As noted previously, petitioner does not contest this adjustment.

The Jacksons also spent the following amounts on their new home in 1971:

| | |
|---|---:|
| Furniture | $873.62 |
| Bedroom set | 490.11 |
| Mirrors | 740.58 |
| Living room furniture | 2,250.00 |
| Interior decorating services | 2,400.00 |
| Painting, inside and outside | Not known |
| Kitchen remodeling | 2,405.42 |
| Carpeting | 2,000.00 |
| Draperies, living room, dining room, bedrooms | 1,950.00 |

The Jacksons owned two Cadillacs, both of which were purchased in 1971 for in excess of $16,000. Approximately $10,000 of the purchase price was financed; the remainder was accounted for with a trade-in and cash. During that same year, Henry also purchased two trucks for $11,014.32 which he used in his construction business.

There was a savings account in petitioner's name alone at Central National Bank which was opened in 1969 by petitioner with a deposit of $25. It was later reduced to $5 in 1970 at which time petitioner put the passbook in her dresser drawer. From that point, all activity in that account was on the part of Henry. Petitioner was unaware of this activity. This activity included deposits of $5,000 on February 18 and June 25 of 1971. At the time of Henry's death in 1974, the account had a $5,000 balance, and the passbook was in the possession of a Mr. Scher, a bailbondsman, who had obtained Henry's release from jail in another matter. However, the passbook was never actually assigned to Scher. This account was credited with interest in the amount of $278.82 for the year 1971 which is the same amount of interest as was reported on petitioner's return.

Petitioner and her mother maintained a joint savings account with Cleveland Trust Co. during the year 1971. Her mother died in May 1971. The ledger of this savings account shows a balance as of May 1971 of $1,773.69, and deposits subsequent to May 1971 in successive amounts of $276.54, $76.54, $539.29, $50, $675.60, $351.20, $225.20, and $510, totaling $2,704.37, with a yearend balance of $3,913.01.

During 1971, Henry opened a savings account as a "gift to

minor" account for Marcus Jackson, the 9-year-old son of the Jacksons. On August 20, 1971, he deposited $5,000 in cash to this account and on September 10, 1971, he deposited another $5,000. Petitioner was generally aware that these deposits had been made.

The Jacksons entered into several business transactions in 1971. These included a purchase agreement for the D & J Delicatessen, Inc., at 17410 Harvard Avenue, Cleveland, Ohio, on September 24, 1971. Under this agreement, petitioner made a downpayment of $2,000 followed by an additional payment of $6,725. Subsequently, the sale fell through, and petitioner received back the $8,725 in 1972. The Jacksons also acquired an interest in Liz's Lounge, 10537 Euclid Avenue, Cleveland, Ohio, which had a cost basis to the Jacksons of $5,000 on December 31, 1971. In addition, Henry purchased real estate at 1207 East 108th Street, Cleveland, Ohio, from Albert A. Mucco for $1,000 in cash.

Henry maintained girlfriends in apartments which he rented and furnished for them. At least three different locations appear in the record. He rented an apartment at Park Lane Villas for $145 per month beginning June 1, 1971. It is not clear how much he spent furnishing that apartment, but apparently it was in excess of $3,000. Beginning December 1, 1971, he also rented an apartment in Forest Park Towers for $175 per month. He spent only a few hundred dollars furnishing that apartment in 1971. He also maintained a place in Warrensville, Ohio, on Mayfair Lane. It is not clear whether he owned or rented it, or what the rental might have been, but he apparently spent about $2,500 furnishing it in 1971. It also appears that Henry had maintained multiple apartments for some time prior to June of 1971. Petitioner was unaware of these expenditures.

Petitioner completed schooling only through the sixth grade. In 1971, she was 39 years of age. She apparently had known Henry since 1956 and married him in 1963. She was employed as a cook assistant for about 1½ years during their marriage, having quit in May 1971 when her mother died so that she could stay home with her children (petitioner had four children by a previous marriage). Petitioner believed her husband was a cement contractor. Apparently, the Jacksons' unreported income came mainly from Henry's dealings in narcotics, although the record is silent as to the amount which he earned in that manner.

Petitioner knew nothing about their finances, and was physically abused by Henry when she inquired as to the inflow and outflow of funds. She had no knowledge of tax matters and signed the returns when requested to do so by her husband. On occasion, when Henry would come home with large sums of cash, she thought it was for the payroll and supplies of his business. Henry bought, without consulting petitioner, all significant items such as their house, the cars, the home furnishings, and the trucks for his business.

Against this backdrop, the question we must answer is whether petitioner comes within the purview of section 6013(e).

## OPINION

The statutory provision in issue reads as follows:

(1) IN GENERAL.—Under regulations prescribed by the Secretary, if—

(A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return,

(B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and

(C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission,

then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income.

The regulation, section 1.6013–5(a), Income Tax Regs., basically follows the statutory language except that it provides a definition for the term "inequitable" which appears in section 6013(e)(1)(C).

First, it is to be noted that there is no issue with respect to the omission of income requirement of section 6013(e)(1)(A). The parties have stipulated that this requirement has been met. All three requirements must be satisfied, however, and it is the remaining requirements imposed by section 6013(e)(1)(B) and (C) which give rise to the issue herein. *Adams v. Commissioner*, 60 T.C. 300 (1973).

Section 6013(e)(1)(B) requires that "in signing the return * * * she did not know of, and had no reason to know of, such

omission." It is this requirement which we believe petitioner cannot satisfy. Based on our evaluation of petitioner's credibility, we do not hesitate to find that she had no actual knowledge of the omitted income. However, we believe she is unable to satisfy the alternate prong of the test, that she had no reason to know of such omission.

In order to satisfy her burden of proof with regard to whether she had reason to know of the omitted income, petitioner must establish that a reasonably prudent taxpayer, with her knowledge of the family finances, would have no reason to know of the omission. *Sanders v. United States*, 509 F.2d 162, 166–167 (5th Cir. 1975). We believe that once the facts are marshalled it is clear that a reasonably prudent taxpayer, with petitioner's knowledge of the family finances, would have had reason to know of the omission.

The return which petitioner signed disclosed adjusted gross income of $13,983 and taxable income of $10,458, as contrasted with a correct taxable income of $86,291.39. While the mere fact of the discrepancy may not be sufficient to find that a reasonably prudent taxpayer had reason to know of the omission, where the spouse makes unusual or lavish expenditures, a taxpayer is on notice. *Sanders v. United States, supra* at 167.

In 1971, the Jacksons purchased a new home, an interest in Liz's Lounge, two Cadillacs, and two trucks and spent substantial amounts on home improvements and furnishings. They also attempted to purchase a delicatessen toward which they made a substantial payment. Petitioner had knowledge of these purchases, was specifically aware of the cost of the home and downpayment, and the payment made on the delicatessen, and must have generally known of the expensive nature of the other items purchased. The cash downpayment of $13,500 made on the home was over $3,000 more than the taxable income reported by petitioner in 1971. The facts available in the record indicate that with respect to the house, furnishings, delicatessen, and the interest in the lounge, the Jacksons' cash outflow was approximately $40,000. This does not include the $10,000 placed in Marcus Jackson's account, the savings deposits made by petitioner of $2,804.37 to the joint account which she had with her mother, or the various other cash outflows obviously necessary based on the record. (This would include, among other things, mortgage payments on the house and payments on the notes on

the Cadillacs and trucks.) We must conclude that a reasonably prudent taxpayer possessing petitioner's knowledge of their financial transactions would have had reason to know of the income omission.

Petitioner's brief is directed principally at the issue of whether it is equitable to find petitioner liable in this case. Given the facts of this case, it may be inequitable or harsh to saddle petitioner with liability. But inequitability is not an alternative test, rather it is one part of a three-part test all parts of which must be satisfied in order to relieve a spouse of liability. *Adams v. Commissioner, supra; Sonnenborn v. Commissioner,* 57 T.C. 373 (1971). Petitioner has failed the second prong of the test. Thus, it is clear that even if petitioner could satisfy us that it would be inequitable to hold her liable for the deficiency in tax, an issue we do not decide, she still would not qualify for the relief from personal liability granted by section 6013(e).

*Decision will be entered for the respondent.*