FLORA LEON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Leon v. Commissioner
Docket No. 2257-78.
United States Tax Court
T.C. Memo 1981-505; 1981 Tax Ct. Memo LEXIS 240; 42 T.C.M. (CCH) 1060; T.C.M. (RIA) 81505; September 14, 1981
Richard L. Wolk and *241 Milton Silverman, for the petitioner. William F. Garrow, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in Federal income taxes for the taxable years 1973 and 1974 in the amounts of $ 85,445.92 and $ 34,944.40, respectively, and an addition to the tax under section 6653(b) [1] for the year 1973 in the amount of $ 42,722.96. Petitioner and her then husband filed joint tax returns for those years. [2] In his answer to the petition in this case, respondent asserted in the alternative a negligence addition under section 6653(a) for the year 1973. Respondent now concedes that petitioner Flora Leon is not liable for any addition to the tax under either section 6653(a) or section 6653(b). The only issue before the Court is whether petitioner Flora Leon is an innocent spouse under section 6013(e) so as to be relieved of her joint and several liability for the deficiency in the tax for each year. *242 FINDINGS OF FACT Some of the facts have been stipulated and are so found. At the time of filing the petition in this case, Flora Leon (hereinafter petitioner) had her legal residence at 2705 Griffith, Berkley, Michigan. For the taxable years 1973 and 1974, petitioner and her then husband, Jordan Leon, filed joint income tax returns at the Internal Revenue Service Center in Cincinnati, Ohio. The 1973 return was filed on or before April 15, 1974, having been signed by both spouses on April 12, 1974. The 1974 return was filed on July 14, 1975, having been signed by both spouses on or about July 10, 1975 and having been mailed to respondent in an envelope postmarked July 10, 1975. Respondent timely issued a statutory notice of deficiency to petitioner and Jordan Leon on December 19, 1977. Petitioner and Jordan Leon were married in June of 1945. Both spouses worked and in 1949 purchased the residence at 2705 Griffith in Berkley, Michigan. Their only child, Gregory Leon, was born in 1957. After Gregory's birth, petitioner did not work outside of the home for the next five years. Thereafter, petitioner was employed outside of the home, working full or part time. From 1966 *243 onward, petitioner worked full time as a key punch operator. About 1967 Jordan Leon permanently moved out of the family residence, and he and petitioner never lived together thereafter. Beginning about that time, Jordan Leon began operating a hotel known as the Henry Hotel, taking over the business from his father who had decided to return to his native Greece. The hotel was located in a poor area of downtown Detroit, Michigan, and catered to retired persons with low incomes and other persons of limited means. At least initially after his departure from the family residence, Jordan Leon lived at the Henry Hotel. For some years prior to 1973, during 1973, and until May 10, 1974, the Henry Hotel was used for prostitution on a substantially continuing basis with the knowledge and consent of Jordan Leon who participated in the profits from the prostitution operation. [3] On May 10, 1974, the police raided the hotel and terminated that activity. During 1973 and 1974 Jordan Leon received 30 percent of the earnings of the prostitutes and also received $ 3 (increased to $ 4 in 1974) each time a room in the Henry Hotel was "rented" to a prostituted for a particular "customer." *244 After the spouses' separation in 1967, petitioner and her son continued to live in the family residence. Jordan Leon provided petitioner at least $ 70 a week and paid the expenses for the operation of the family residence. That was the same financial arrangement that had existed before the spouses separated, and no changes were made in the arrangement over the years. Jordan Leon normally visited his son at the family residence every Sunday, and on those visits he would give petitioner the $ 70 and other cash for certain payments on certain rental properties, which will be discussed below. Occasionally petitioner and her son would go to the Henry Hotel on Sunday to see Jordan Leon and to obtain the cash amounts referred to above. Occasionally, at Jordan's request, petitioner would run an errand for him or bring to the hotel items such as soda pop and other supplies he needed. However, petitioner normally spent very little time at the hotel, and she actually entered the hotel on only one occasion. By 1973 and 1974 petitioner was aware that prostitutes rented room at the hotel, but until the police raid on the hotel in May of 1974 and the subsequent newspaper publicity about the *245 raid and her husband's criminal trial, petitioner was unaware of Jordan Leon's financial participation in such prostitution activities. In addition to the $ 70 per week received from Jordan Leon, petitioner occasionally received other amounts of cash for payments for a roof, a burglar alarm, or furniture for the home. Petitioner and her son lived very modestly. The record does not establish that petitioner received any money or property from Jordan Leon other than normal support [4] and property purchased prior to 1973. So far as petitioner was aware, Jordan Leon's life style was also very modest. However, Jordan Leon had purchased various rental properties and certain other properties over the years. Petitioner was aware of some but not all of the properties owned by Jordan Leon. He *246 frequently asked her to run errands to the bank to make various cash payments in connection with the rental properties. He furnished the cash for these payments, and petitioner returned all paid bills and receipts to him. Petitioner had no information or knowledge as to the gross receipts from those rental properties or the expenses connected with those properties. Petitioner never had access to any books or records that Jordan Leon might have maintained in connection with either the rental properties or the Henry Hotel. The income and expenses of the rental properties are not involved in this case. During the years of her marriage to Jordan Leon, petitioner always filed joint tax returns with her husband.Petitioner always turned over her W-2 Forms (wage statements) to Jordan Leon, who in turn prepared or caused to be prepared their joint tax returns. After their separation in 1967, Jordan Leon then brought the completed joint tax return to petitioner at the residence in Berkley for her signature.She always signed the return without examining it. For the year 1973 there was omitted from gross income on the spouses' joint tax return an amount of $ 97,000 that was properly includable *247 in income for the year. The $ 97,000 was attributable to Jordan Leon's prostitution and room rent activity in the Henry Hotel. That amount was in excess of 25 percent of the amount of gross income stated in the return for 1973. After the police raid on the Henry Hotel on May 10, 1974, the newspapers carried stories about the prostitution business carried on by Jordan Leon. There were newspaper headlines about the "international prostitution ring," referring to the fact that Jordan Leon transported Canadian girls into the United States for immoral purposes. At that time petitioner learned about her husband's financial participation in the prostitution business at the Henry Hotel. She also learned that her husband no longer lived at the hotel but lived with one of the prostitutes in a house in Detroit owned by her husband and the prostitute. Jordan Leon was indicted in May of 1974 on six felony counts involving allged violations of 18 U.S.C. §§ 2421 and 2422. On August 20, 1974, Jordan Leon was found guilty of four of the six counts contained in the indictment for the charges under 18 U.S.C. § 2421. He was sentenced to prison and *248 fined as a result of that conviction. For the year 1974 there was omitted from gross income on the spouses' joint tax return an amount of $ 39,000 attributable to the prostitution and room rent activity in the Henry Hotel. That amount was properly includable in gross income and was in excess of 25 percent of the gross income stated in the joint return as filed. There was attached to the joint return for 1974 a statement signed only by Jordan Leon, stating as follows: The enclosed Schedule C 1040-1974 for Jordan Leon only contains income and expense information for the period from May 1, 1974 to December 31, 1974. The income and expense information for the period from January 1, 1974 to April 30, 1974 is contained in records which were confiscated by agents of the U.S. Department of Justice.These records have not been returned to us. At such time as the records are returned an amended return will be filed. Petitioner did not read that statement before signing the joint return for 1974. Although her signature on the 1974 return was not dated, she signed the return on or about July 10, 1975. On or about February 1976 petitioner comenced divorce proceedings against Jordan *249 Leon. There was a trial in the divorce case in February 1977 and a judgment of divorce was finally entered on February 17, 1978. In the divorce proceedings petitioner received the family residence at 2705 Griffith in Berkley, Michigan, then valued at $ 27,500, and the furnishings in the home. She received another property described as 414-418 Maryland in Royal Oak, Michigan, that had been purchased with Jordan Leon's funds in 1967 but placed in both spouses' names. She also received an undivided one-half interest in a property acquired in 1961 by the spouses' remortgaging the family residence and an undivided one-half interest in another property acquired in 1971 by Jordan Leon but placed in the names of both spouses. Jordan Leon received at least five other properties and various other investments. Petitioner also received certain shares of common stock of Colt Industries purchased by her prior to 1957 from her employer, some Detroit Edison Company common stock acquired with her earnings prior to 1973, a $ 12,000 savings certificate acquired by inheritance from her mother, and a small bank account in petitioner's name totalling less than $ 1,000. All of the property awarded *250 to petitioner in the divorce proceeding originated from her separate earnings or from an inheritance or were acquired by the spouses prior to 1973.[5]
The deficiencies in income taxes for the taxable *251 years 1973 and 1974 resulting from the omitted income from the prostitution and room rent activity at the Henry Hotel are in the respective amounts of $ 25,759.77 and $ 14,472.35. [6]
OPINION The only issue in this case is whether petitioner is an innocent spouse within the meaning of section 6013(e)(1) [7] and hence not liable for any of the deficiencies in tax for the years 1973 and 1974 when she filed joint returns with her then husband. Normally the liability for the tax on a joint return is joint and several. Section 6013(d)(3). The spouse who seeks relief from that joint and several liability as an innocent spouse under section 6013(e)(1) must establish each and every one of the three factors or requirements set out in that provision. Adams v. Commissioner, 60 T.C. 300 (1973). *252 Innocent-spouse relief is available only in cases of omitted income of rather substantial amounts. Section 6013(e)(1)(A). Here there is no question that for each year there was an omission of gross income attributable to Jordan Leon's prostitution and room rent activity at the Henry Hotel, and that such omitted income was in excess of 25 percent of the amount of gross income stated in each return. [8] Thus, the first prerequisite for innocent-spouse protection has been met. *253 The second factor is the statutory requirement that "the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission." Section 6013(e)(1)(B). The standard for making that determination is whether a reasonably prudent person in petitioner's circumstances at the time of signing the return could be expected to know of the omission. Sanders v. United States, 509 F. 2d 162, 166-167 (5th Cir. 1975); Estate of Jackson v. Commissioner, 72 T.C. 356, 361 (1979); Terzian v. Commissioner, 72 T.C. 1164, 1170 (1979). [9] We must examine all of the facts and circumstances to determine whether petitioner knew or had reason to know of the omission each year. This involves resolution of seemingly conflicting testimony by petitioner and Janet Sutton, one of Jordan Leon's nieces.
As early as 1968 or 1969, Janet Sutton was aware that her uncle was running a house of prostitution. In 1971 at the time another niece, Margaret Jordan, lived in petitioner's *254 home for the summer, that niece assumed that prostitutes were frequenting her uncle's hotel "because it is that type of neighborhood." The young nieces apparently were aware of something that petitioner says she did not know at the time. Considering petitioner's long estrangement from her husband, it would not be unreasonable that her husband's blood relatives might have known more about his business than petitioner knew. It is undisputed that despite her long estrangement from her husband, petitioner in 1973 and 1974 met Jordan's sister, Mrs. Blanche Caras, and her daughter, Janet Sutton, for lunch on a fairly regular basis. What is in dispute is the conversation among the three women during those lunches and the extent of petitioner's knowledge of her husband's prostitution business as revealed by those conversations. Jordan Leon's prostitution business was not a subject of pride on the part of the women in his family and clearly was never the focal point of their conversations, at least not before the arrest and the resulting newspaper publicity and unwelcome notoriety. That fact, plus the fact that petitioner was a rather reserved individual, reinforces the Court's view that *255 prostitutes and prostitution were not discussed freely or often during those luncheons, at least not before Jordan's arrest. The conflicts between petitioner's testimony and that of Janet Sutton are more apparent than real. To some extent the conflicts can be explained by the fact that Janet Sutton and her mother no doubt knew a great deal more about Jordan's business than petitioner did, and they assumed that petitioner had the same information they possessed. Whether petitioner specifically knew about Jordan Leon's girlfriend, the prostitute with whom he was living, or whether petitioner ever referred to the prostitutes as "the girls" or "Jordan's girls" are mere details and would not be determinative of her knowledge of the illegal income or the omission of that income from the tax returns. On the other hand, petitioner knew a bit more about the prostitutes than she is willing to admit. Petitioner admits that about two years before her husband's arrest she became aware that he was renting rooms at the hotel to prostitutes, but she says she did not know about her husband's financial participation in the prostitution business. The Court has accepted petitioner's testimony that *256 she went to the Henry Hotel only a few times, that those few times she went there only during the day time and only on Sundays, that she had actually been inside the hotel only one time, and that on that one occasion she had seen no one there except her husband. Testifying about that one occasion on which she was inside the hotel, petitioner insisted that "I didn't see anything. I didn't look. I was ready to run out." Her testimony strongly suggests that she knew or suspected something. Respondent tries to establish that petitioner had knowledge about her husband's financial participation in the prostitution business even before the 1973 tax return was filed. Respondent points to certain sworn testimony by petitioner at the time of her divorce trial. That trial occurred in February 1977.Jordan Leon was still in prison, and he was brought in from the prison for the divorce proceeding. At that time petitioner testified that about three years earlier, which would have been in late 1973 or early 1974, she had heard her husband mention that he made $ 8,000 a week from the hotel business.[10] At the trial of this case petitioner attempted to undercut or explain away that testimony *257 by suggesting it was simply something she had overheard her husband state to her son and that she was not really sure what it was she had overheard. The Court did not find her helated explanation to be convincing. At the commencement of the divorce trial, her attorney, who also represented her in the Tax Court proceeding, opened his examination of Jordan Leon by asking him if he did not earn $ 8,000 a week. The lawyer stated on the record that "She [petitioner] claims he made $8,000." Jordan Leon denied that he made that much money from the hotel business. Thereafter, petitioner was called as a witness in the divorce proceeding and testified as follows: Q (By Mr. Wolk, continuing) Now, did you ever hear your husband or did your husband ever tell you anything about how much money he was making in that hotel business? A He mentioned one time he was making *258 either thousand a week.
Q When was that? A About three years ago. Q Three years ago? A Yes, uh-huh. There was no suggestion at that time that petitioner was uncertain about her husband's statement. On the other hand, that sworn testimony does not so clearly establish the exact point in time so as to show that petitioner had such knowledge on or before April 12, 1974, when she signed the joint tax return for the year 1973.While the issue is very close and there are factors pointing in both directions, the Court concludes that up until her husband's arrest on May 10, 1974, petitioner had no knowledge of or reason to know of the fact that her husband was in the prostitution business or at least no reason to know that he had omitted any gross income from that business from their joint return for 1973. The situation in regard to the 1974 joint return is quite different. In addition to petitioner's earlier sworn testimony about the $ 8,000 per week, which clearly indicated she had such knowledge during 1974, there is the critical fact of her husband's arrest. After her husband's arrest in May of 1974 and his subsequent criminal trial and conviction in August of 1974, petitioner *259 had actual knowledge of her husband's income from the prostitution business. When she signed the joint return for 1974 on or about July 10, 1975, she knew that Jordan Leon had such income. Nevertheless petitioner suggests that she signed that return in just the same way that she had signed all prior joint returns, namely, that Jordan brought the return to the house in Berkley and handed it to her in the kitchen to sign and that, as she had done in the earlier years, she signed the return without looking at it. When questioned as to whether or not she asked her husband if there was any income in that return attributable to the prostitution business she replied "No, I did not. I didn't ask any questions. I just automatically signed the income tax form." However domineering Jordan Leon may have been in earlier years, the Court cannot find that he continued to so dominate petitioner after his absence from the family home for some eight years, his criminal conviction, and his imminent if not actual incarceration. Petitioner's explanation that "I just didn't discuss money with Jordan" is wholly unreasonable under the circumstances that existed by July of 1975. She had actual knowledge *260 of his income from the prostitution business, and she knew or shoul have known that such income was omitted from the joint return. There was attached to the return itself a statement signed by Jordan Leon that pointed out that the return did not include the income for the period from January 1 to April 30, 1974. See footnote 8. Based on all of the facts and circumstances discussed above, we conclude that petitioner knew of or had reason to know of the omitted income on the 1974 joint return. Thus, the second prerequisite for innocent-spouse protection has not been satisfied for the year 1974, and petitioner is not entitled to such relief for that year. However, since we have concluded that she did not know or have reason to know of the omission for 1973, we must now consider the third factor or prerequisite under section 6013(e)(1)(C) for that year. The third factor requires a finding that it would be inequitable to hold petitioner liable for the deficiency in tax for 1973. In reaching that factual determination, the statute requires us to take into account whether or not petitioner "significantly benefited directly or indirectly from the items omitted from gross income" and *261 further to take into account "all other facts and circumstances." Section 6013(e)(1)(C); Sanders v. United States, supra at 170-171. Based on the record as a whole, we cannot find that petitioner "significantly benefited" either directly or indirectly from the omission of gross income for 1973. She and her son had lived very modestly over the years and so far as she knew Jordan Leon also lived very modestly. There was no evidence of any extravagant purchases or luxuries of any kind. However, under the "all other facts and circumstances" language, there is the troubling fact of the rather substantial accumulation of rental properties, some of which petitioner later received in the divorce proceeding.However, all of those properties were acquired prior to 1973 and none was acquired with the income omitted for that year. It may well be that some of the properties were acquired with proceeds from the prostitution business in earlier years and it may well be that such illegal income may have been omitted from the parties' joint returns in those earlier years, but there is nothing in the record to establish that to be the fact. While the issue is a close one, *262 the Court concludes that it would be inequitable to hold petitioner liable for the deficiency in tax for 1973. Therefore she is entitled to the protection of the innocent-spouse provisions for 1973 but not for 1974. Decision will be entered for petitioner for 1973 and for respondent for 1974. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and as in effect for the taxable years involved in this case, unless otherwise indicated. ↩
2. Petitioner's husband, Jordan Leon, filed a petition in the Tax Court in regard to these same deficiencies and addition to the tax, which was docketed as Docket No. 1975-78. That case was settled by the parties thereto. Pursuant to the settlement, the Court entered a decision on January 8, 1981, that there were deficiencies in income taxes due from petitioner Jordan Leon for the taxable years 1973 and 1974 in the amounts of $ 25,759.77 and $ 14,472.35, respectively, and that there was an addition to the tax due from petitioner Jordan Leon for the taxable year 1973 under the provisions of section 6653(b) in the amount of $ 12,879.89.↩
3. Although the phrase "For some years prior to 1973" was stricken from paragraph 7 of the parties' stipulation, the testimony of Jordan's niece, Janet Sutton, establishes that the prostitution business was in operation as early as 1968 or 1969.↩
4. Respondent contends that items such as a carpet or burglar alarm for the house are not normal support within the terms of the pertinent regulations. Section 1.6013-5(b), Income Tax Regs.↩ We think respondent's interpretation of "normal support" is too restrictive and that normal support is not limited to bare subsistence or to absolute necessities of food, clothing, and shelter only.
5. The sole exception was a bank account that Jordan Leon established in his son's name, which at the time Jordan Leon went to prison contained $ 11,000 that he had accumulated over a five-year period for his son's college education.When Jordan Leon went to prison, petitioner's name was added to that account for convenience. Petitioner ultimately received $ 5,500 of that amount after the son was killed in an automobile accident in April 1978. Respondent suggests that petitioner received that sum as a part of the divorce settlement, and petitioner herself erroneously stated as much in her testimony. However, the record shows that the judgment of divorce was entered in February 1978 before the death of Gregory Leon occurred. The judgment of divorce did nothing more than direct the parents to continue as trustees of the savings account for the benefit of the son. It seems clear that, after Gregory's death, petitioner received that money only as one of the surviving heirs of her son.↩
6. These are the same amounts for which decision has already been entered against Jordan Leon in his separate case. The Court assumes that respondent has attempted or will attempt to collect those deficiencies from Jordan Leon. See footnote 2 above.↩
7. SEC 6013. (e) Spouse Relieved of Liability in Certain Cases.-- (1) In General.--Under regulations prescribed by the Secretary or his delegate, if-- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income.↩
8. Section 6013(e)(2)(B) provides that for purposes of innocent-spouse protection "the amount omitted from gross income shall be determined in the manner provided by section 6501(e)(1)(A)." That section in turn provides, in pertainent part, that (ii) In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary or his delegate of the nature and amont of such item. Respondent initially argued that Jordan Leon's statement attached to the 1974 return came within this language so that there would be no omission of the type required to bring the innocent-spouse provisions into operation. Since respondent did not discuss this argument in his briefs, we assume respondent has abandoned it. Therefore, we need not decide whether the statement attached to the return was "adequate to apprise the Secretary or his delegate of the nature and amount" of the omitted income, within the meaning of section 6501(e)(1)(A)(ii). However, the very fact of that statement is another factor for the Court to weigh and consider in determining petitioner's actual or constructive knowledge of an omission of income for 1974.↩
9. See also Ratner v. Commissioner, T.C. Memo. 1981-333 and Johnson v. Commissioner, T.C. Memo. 1980-569↩.
10. During the divorce trial, the judge properly refused to permit petitioner to testify about the nature of her husband's business, but petitioner by that time of course knew about the prostitution business. The whole line of inquiry about his income from the hotel business related to his income from prostitution.↩