NORBERT A. YOUNG and JANICE V. YOUNG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Young v. Commissioner
Docket No. 9221-79.
United States Tax Court
T.C. Memo 1981-531; 1981 Tax Ct. Memo LEXIS 211; 42 T.C.M. (CCH) 1156; T.C.M. (RIA) 81531; September 22, 1981. *211 H and W filed a joint Federal income tax return for 1972. They omitted income exceeding 25 percent of the gross income stated on the return, and the omitted income was attributable to H. Held, W is not entitled to relief as an innocent spouse under sec. 6013(e), I.R.C. 1954, since she has failed to prove that she did not know or have reason to know of the omission of income. Edward J. Calihan, Jr., for petitioner Norbert A. Young. Richard M. Kates, for petitioner Janice V. Young. Francis J. Emmons, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined a deficiency of $ 5,653.52 in the petitioners' Federal income tax for 1972 and an addition to tax of $ 2,826.76 *212 under section 6653(b) of the Internal Revenue Code of 1954. [1] After concessions by both parties, the sole issue to be decided is whether petitioner Janice V. Young is entitled to relief from liability as an "innocent spouse" within the meaning of section 6013(e). FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Norbert A. Young and Janice V. Young, resided separately in Calumet City, Ill., at the time they filed their petition in this case. During 1972, the petitioners resided together as husband and wife and timely filed a joint Federal income tax return with the Internal Revenue Service Center, Kansas City, Mo. In 1974, they were divorced. In 1963, Mrs. Young received a bachelor of science degree in education. Thereafter, she worked as both a part-time substitute teacher and as a full-time elementary school teacher. In 1972, Mrs. Young was employed full time as an elementary school teacher and received a salary of $ 10,314.43; her take-home pay was $ 349.00 every 2 weeks. In 1979, Mrs. *213 Young received a graduate degree with a specialization in reading. During 1972, Mr. Young worked for Xerox Corporation as a sales manager and received compensation in excess of $ 22,000 for that year. That year, Mr. Young took leave from Xerox in order to become the campaign manager for the Mayor of Calumet City, Ill., Mr. Stefaniak (the Mayor). The Mayor and Mr. Young were not only business associates but were also very close friends. They were often out together until late hours, the Mayor being a bachelor at the time. Mrs. Young handled most of the family finances, including the monthly mortgage payment of $ 352.51, the car payments, installment credit payments, utility bills, and clothing bills. She was familiar with the monthly income and expenses of the family. During 1972, the Youngs did not have a large savings account and owned no stocks or other investments, other than rental property. Insofar as Mrs. Young was aware, they did not receive any gifts or inheritances during that year.Occasionally, Mr. Young gave Mrs. Young some money to help her pay bills, but it was always inadequate to meet household expenses. Mrs. Young's requests for money were met with statements *214 that she was capable of supporting their two minor children and the household on her salary without the need for Mr. Young to turn over his salary to Mrs. Young. As a result, Mrs. Young constantly relied on credit to meet the needs of the household. She understood that much of Mr. Young's salary was used to fund the Mayor's campaign rather than for the support of the household. As a result of torrential rains and flooding on August 25, 1972, the administrator of the Small Business Administration (SBA) declared the area in and about Calumet City, Ill., to be a disaster area, enabling its residents to apply for special disaster loans. The victims of such a natural disaster who meet certain criteria are entitled to obtain low-interest loans from the SBA to repair or replace property damaged by the natural disaster.The SBA will forgive up to $ 5,000 of the indebtedness if a qualified loan recipient submits receipts evidencing his use of the loan proceeds to repair or replace property damaged by the natural disaster. In order to obtain such a loan from the SBA, an applicant is required to submit two forms--an "Application for Disaster Loan--Home" (Form 5C) and an application for "Personal *215 Property Damaged or Destroyed by Disaster" (Form 824)--to an appropriate SBA local disaster relief office. Approved loans were paid by a U.S. Treasury check issued to the loan applicant. The property of Mr. and Mrs. Young was damaged by the rain and flooding on August 25, 1972, and shortly thereafter, Mr. Young discussed with Mrs. Young the possibility of filing an exaggerated claim for a disaster loan with the SBA. He said that it was "easy money." However, she did not trust him, and she refused to go along with such plan; in fact, she threatened to divorce him if he pursued the loan. Sometime thereafter, Mrs. Young was present when Mr. Young discussed with the Mayor the possibility of applying for the SBA loan. The Mayor also sought to dissuade him, advising him not to apply for the money because "There are bigger things we can do legally." At this point, Mr. Young assured the Mayor and Mrs. Young that he would not apply for such a loan. Notwithstanding his earlier representations to the Mayor and Mrs. Young, on or about September 18, 1972, Mr. Young submitted an application for a disaster loan and a "Personal Property Damaged or Destroyed by Disaster" listing to the Chicago *216 branch office of the SBA. On such application and listing, he claimed personal property damage of $ 4,975 as a result of basement flooding in the petitioners' personal residence caused by the August 25, 1972, rainstorm. Mrs. Young did not participate in the preparation or submission of such forms. On or about October 18, 1972, Mr. Young received a U.S. Treasury check for $ 5,000 representing the proceeds of the disaster loan from the SBA. Mr. Young cashed the check that day. Although the check purports to contain her endorsement, Mrs. Young did not endorse such check. On or about October 19, 1972, Mr. Young gave Mrs. Young $ 3,600 in cash along with a $ 130 rent check telling her that the money had come from "A deal that the mayor and I had made." Mrs. Young deposited these funds, less a withdrawal of $ 50 in cash, into her separate checking account. After the deposit was made, Mrs. Young proceeded to issue the following checks on her account for the purposes indicated: Date
Check No.
Payee
Amount
Purpose
10/23/72
2156
Marshall Field
$ 332.81
Furniture
10/26/72
2161
Marshall Field
873.60
Bedroom furniture
10/21/72
2196
John M. Smyth
45.10
Payment
10/19/72
2197
John M. Smyth
114.45
Payment
10/23/72
2199
General Electric
365.60
Loan payment
Credit
11/30/72
2238
Marshall Field
338.20
Furniture
*217 For some time, the Youngs had considered buying new furniture but could never afford it. In August 1972, Mrs. Young began to shop seriously for such furniture, ordering much of it befor receiving the cash payment from Mr. Young on October 19, 1972. In late October or in November 1972, Mrs. Young found in her husband's drawer a signed and completed copy of the application for the SBA loan. Such application was signed by Mr. Young and dated September 18, 1972. Mrs. Young secretly made photocopies of such application and then returned it to her husband's drawer. Her purpose for copying such document was to use it as evidence in a contemplated divorce proceeding. During 1972, Mr. Young was acquainted with Jerry Callahan, who then was an SBA employee involved in the processing of disaster loans made to residents of the Chicago metropolitan area. During that year, Mr. Young and Mr. Callahan assisted several individuals in fraudulently procuring disaster loans. Such individuals paid a portion of their loan proceeds to Mr. Young and Mr. Callahan in return for their assistance. As a result of all of Mr. Young's illegal activities involving the SBA loans, he received in 1972 total *218 payments of $ 9,100. On or about July 1, 1974, Mr. young and Mr. Callahan were indicted in the U.S. District Court for the Northern District of Illinois on 12 counts involving alleged violations of various provisions of Titles 15 and 18 of the U.S. Code for willfully and knowingly abetting and counseling individuals to make false statements for the purposes of obtaining disaster loans. Mr. Young entered a plea of guilty to counts 1, 4, 7, and 8 of the indictment, and on December 21, 1976, a judgment of conviction was entered on the plea. Mr. Callahan went to trial, and in 1976, Mrs. Young testified as a witness at such trial. In his notice of deficiency, the Commissioner determined that the petitioners were liable for a deficiency as a result of several adjustments in their income, such as the inclusion of the illegal income received by Mr. Young, and the parties have now agreed on the amount of the deficiency. The Commissioner also determined that Mr. Young was liable for the addition to tax under section 6653(b) for fraud, and Mr. Young concedes his liability for such addition to tax. OPINION The sole issue for decision is whether Mrs. Young is entitled to be relieved *219 of liability for the deficiency as an innocent spouse under section 6013(e), which provides, in part: (e) Spouse Relieved of Liability in Certain Cases.-- (1) In general.--Under regulations prescribed by the Secretary, if-- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefitted directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from *220 gross income. In order to obtain the benefit afforded by such statute, a putative innocent spouse bears the burden of proving that all three of the conditions of section 6013(e)(1) have been met. Rule 142, Tax Court Rules of Practice and Procedure; Estate of Jackson v. Commissioner, 72 T.C. 356, 360 (1979); Sonnenborn v. Commissioner, 57 T.C. 373, 380-381 (1971). It has been stipulated by the parties that the requirements of section 6013(e)(1)(A) have been met. However, after considering Mrs. Young's testimony and all the other evidence, we find that Mrs. Young fails to meet the requirements of section 6013(e)(1)(B) and accordingly is not eligible for any relief under such section. To satisfy the requirements of section 6013(e)(1)(B), a spouse must prove both that she did not have actual knowledge of the omission of income and that she did not have reason to know of such omission. Thus, it is not enough for her to show that she lacked actual knowledge of the omission, but she must also show that she had no reason to know of the omission. See Adams v. Commissioner, 60 T.C. 300 (1973); Sonnenborn v. Commissioner, supra. *221 To show that she had no reason to know of the omission, she must convince the Court that a reasonably prudent person with her knowledge of the surrounding circumstances would not have known of the omission. Sanders v. United States, 509 F. 2d 162, 166 (5th Cir. 1975); Estate of Jackson v. Commissioner, supra at 361. Furthermore, "a spouse cannot close her eyes to * * * facts, that might give her reason to know of the unreported income." Terzian v. Commissioner, 72 T.C. 1164, 1170 (1979); Mysse v. Commissioner, 57 T.C. 680, 699 (1972). The fact that Mrs. Young began to shop seriously for the new furniture at about the time Mr. Young began discussing the possibility of filing a false claim for an SBA disaster loan causes us to wonder about her actual knowledge of the omitted income. She handled the family finances, and she was fully aware of their shortage of income to meet their regular expenses. We accept her testimony that they desperately needed the new furniture, but we wonder how she expected to pay for it. She claimed that she planned to use credit if necessary, but she was already making purchases on *222 credit. In view of her shortage of funds, the purchase of the furniture even before Mrs. Young received the $ 3,600 in cash from Mr. Young suggests that she may have been expecting a substantial sum of money from some source. In addition, Mrs. Young's knowledge of the circumstances surrounding the loan casts even more doubt on her position. In August 1972, she knew that Mr. Young was considering applying for an SBA disaster loan; he considered it "easy money." Later that year, she overheard Mr. Young and the Mayor discuss the possible loan and realized that he was still considering the possibility despite her attempts to dissuade him. Mrs. Young knew that her husband had lied to her and made a habit of concealing things from her. She did not trust him, and when she found the completed and signed application in late October or in November of 1972, she apparently realized that Mr. Young had gone through with his plan to apply for the loan. Mrs. Young asserts that she only looked at the first page of the application and did not fully understand its significance; yet, she made a copy of it, and that fact causes us to believe that she did recognize its significance. We are aware *223 that this was a troubling time in Mrs. Young's life and believe that she was under an emotional strain due to her marital problems with Mr. Young. In this regard, a spouse's emotional condition has been applied as a factor going to determine whether she had reason to know of an omission. See Sanders v. United States, 509 F. 2d at 169. Nonetheless, the facts of this case show that her emotional strain may actually have caused Mrs. Young to scrutinize more carefully her husband's actions than she ordinarily might have. Moreover, at the trial of Mr. Callahan in 1976, the court asked, "When did you first learn that an application for an SBA flood loan had been made," and she responded, "When I found * * * [the application for the loan] in my former husband's drawer." Thus, there, she admitted that the discovery of the application led her to believe that Mr. Young had secured the loan. At that trial, she was a disinterested witness, and her memory was a good deal fresher than at the trial before this Court. For such reasons, we have concluded that her testimony then is more reliable than that given to the Tax Court. A review of the record inevitably leads us *224 to conclude that Mrs. Young has failed to convince us that she did not know, or did not have reason to know, of the omission from their return for 1972 of the income fraudulently obtained by Mr. Young. Consequently, we hold that she has failed to carry her burden of proving that she is entitled to relief under section 6013(e). Having reached that conclusion, it is not necessary for us to resolve whether Mrs. Young satisfied the requirements of section 6013(e)(1)(c). Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during 1972.↩