CHARLES CADWELL III, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cadwell v. Commissioner
Docket No. 10301-79.
United States Tax Court
T.C. Memo 1982-231; 1982 Tax Ct. Memo LEXIS 514; 43 T.C.M. (CCH) 1242; T.C.M. (RIA) 82231; April 29, 1982. *514 H and W filed joint Federal income tax returns for 1975 and 1976. They omitted income exceeding 25 percent of the gross income stated on the return. Held, H is not entitled to relief as an innocent spouse under sec. 6013(e), I.R.C. 1954, since he failed to prove that he did not know or have reason to know of the omissions of income. Donald W. MacPherson and Kirk A. McCarville, for the petitioner. Martha Combellick, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in the petitioner's Federal income taxes: Year
Deficiency
1975
$ 8,798.00
1976
17,836.00
The only issue for decision is whether the petitioner *515 qualifies as an "innocent spouse" within the meaning of section 6013(e) of the Internal Revenue Code of 1954. [1]
FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioner, Charles Cadwell III, was a legal resident of Phoenix, Ariz., at the time he filed his petition in this case. During 1975 and 1976, he was married to Gail E. Cadwell, and they filed joint Federal income tax returns for such years with the Internal Revenue Service Center, Ogden, Utah. Mr. and Mrs. Cadwell were married in 1973. In January 1974, Mrs. Cadwell began work as a premium coordinator for Armour-Dial, Inc. (Armour-Dial), a subsidiary of Greyhound Corporation. The function of a premium coordinator was to formulate promotional programs for different products; she had to develop the program for promoting the product, arrange for the purchase of promotional merchandise, and coordinate the arrangement between the companies involved in the promotion. Mrs. Cadwell became acquainted with Don McQuarry soon after she began work *516 at Armour-Dial. They entered into a business arrangement which also involved her mother, Esther Gross. Under that arrangement, Mrs. Cadwell submitted to Armour-Dial false invoices for merchandise purportedly purchased from Creative Incentives, Inc. (CII). The checks in payment for such merchandise were sent to CII at the address of Mrs. Gross. Mrs. Gross established a checking account in the name of CII with respect to which she had sole authority to draw upon. The checks from Armour-Dial were deposited in that account. When Mrs. Cadwell wished to withdraw funds from such account, Mrs. Gross wrote a check on the account payable to herself and deposited the funds in her own bank account; she then wrote a check to Mrs. Cadwell or to other persons at Mrs. Cadwell's direction. For example, the first check written by Mrs. Gross on the CII account was on February 3, 1975, for $ 2,100 made payable to herself. Such check was deposited in her own account (maintained as a joint account with her husband) on the same day. On February 7, 1975, Mrs. Gross wrote a check from her account to Mrs. Cadwell for $ 2,100, and Mrs. Cadwell deposited that check in the Cadwell joint checking account *517 on that same day. During 1975 and 1976, Armour-Dial issued 35 checks to CII in the amounts of $ 31,622.03 in 1975 and $ 52,185.70 in 1976. Mr. and Mrs. Cadwell both made deposits into their joint checking account, and the balance in that account was $ 429.77 on December 31, 1974. The following schedule represents a summary of deposits and withdrawals in such account during 1975 and the first part of 1976: Statement Date
Deposits
Withdrawals
1/30/75
$ 1,074.64
$ 1,364.81
2/27/75
4,122.72
4,172.90
3/28/75
2,282.54
1,987.06
4/29/75
2,803.98
3,228.59
5/29/75
1,843.30
1,862.84
6/27/75
2,239.98
2,253.85
7/30/75
2,912.66
2,659.32
8/28/75
2,193.89
2,210.75
9/29/75
3,778.12
3,523.32
10/30/75
2,220.13
2,453.14
11/26/75
3,421.32
3,020.63
12/30/75
3,990.24
3,220.18
1/29/76
2,752.51
2,531.84
2/26/76
1,125.13
2,327.35
3/30/76
5,765.73
5,758.57
4/29/76
4,441.39
3,126.36
Total
$ 46,968.28
$ 45,701.51
At the beginning of 1975, Mr. Cadwell worked for Space Craft Mfg. Co., Inc. (Space Craft), and continued there until October of that year. From October 1975 until May 1976, he was unemployed. In May 1976, he obtained a *518 job as a machinist with Connor Mfg. Co., Inc. (Connor), where he continued working through the balance of that year. On occasion, he worked for his father-in-law, Paul Gross, as a contract laborer and was paid for such work by the job. Mr. Gross owned and operated his own construction business, PPG Builders and Construction Company. Mr. Cadwell took care of family financial matters, including paying the weekly bills and balancing the checkbook. He wrote the majority of the checks on the joint account and undertook to compile the material necessary for the preparation of the Federal income tax returns. The following table sets forth the wages reported on the W-2 forms for Mr. and Mrs. Cadwell in 1975 and 1976, the amounts shown on such forms as withheld for income tax and other purposes for such years, and the "take-home pay" for each of them for such years: Wages
Total Withholding
Take-home Pay
1975
Gail Cadwell
(Armour-Dial)
$ 8,918.98
$ 1,986.07
$ 6,932.91
Charles Cadwell
(Space Craft)
8,892.94
2,177.99
6,714.95
Total
$ 17,811.92
$ 4,164.06
$ 13,647.86
1976
Gail Cadwell
(Armour-Dial)
$ 6,701.60
$ 1,490.33
$ 5,211.27
(Ambassador Int'l)
1,298.08
289.03
1,009.05
(Camelback BMW)
381.82
65.59
316.23
Charles Cadwell
(Connor)
7,786.60
1,725.76
6,060.84
Total
$ 16,168.10
$ 3,570.71
$ 12,597.39
*519 In addition, Mr. and Mrs. Cadwell reported interest of $ 27.65 on their Federal income tax return for 1976. The Cadwells purchased a home in the fall of 1974. Beginning in 1975, extensive improvements were made to such home. Such improvements included laying mosaic tiles in the kitchen and in two bathrooms, adding electrical outlets, paneling several rooms, removing and rearranging walls, extending a drop ceiling, and changing a number of light fixtures. A trashmasher was also installed. In addition to those improvements made on the inside of the Cadwell home, some landscaeping was done and a swimming pool was installed. The labor for such improvements was performed in large part by Mr. Gross without charge, but the materials used by him were paid for by Mrs. Gross. During 1975, the Cadwells purchased a 1975 Dodge Ram Charger truck through a trade-in and financing acquired through a bank. In addition, they exercised an option to purchase a Chrysler Imperial, which had been originally leased by them a year earlier. Other expenditures included payments on the home, charge cards, and for materials which were used for remodeling the home and which were not paid for directly *520 by Mrs. Gross. In the latter part of 1975, the Cadwells acquired furniture with a total cost of approximately $ 10,000. Mr. Cadwell made the deposits for the purchase of some of the furniture. In addition, in 1975 and 1976, the Cadwells purchased jewelry, clothing, a 25-inch color television set, appliances, a bedroom set, and dishes. In September 1976, Armour-Dial discovered that it was not receiving the merchandise ordered from CII and suspended Mrs. Cadwell indefinitely while it investigated the matter. When Mrs. Cadwell advised Mr. Cadwell of her suspension and the investigation by Armour-Dial, he went with her to see a lawyer. Mr. Cadwell also accompanied his wife on visits to other lawyers brought in on the case when the severity of the matter became apparent. By January 1977, Mrs. Cadwell was asked for a handwriting exemplar by the police. At some time before 1977, Mr. Cadwell had personally met Mr. McQuarry. Before such meeting, Mrs. Cadwell had told her husband that Mr. McQuarry had offered her a job. In 1975, she also told her husband that she was receiving commissions through an arrangement with Mr. McQuarry. Mr. Cadwell signed the 1976 Federal income tax *521 return on February 13, 1977. In March 1977, Mrs. Cadwell and Mrs. Gross were indicted by the grand jury. In October 1977, Mrs. Cadwell entered a guilty plea for grand theft by false pretenses. Part of the plea arrangement required that Mrs. Cadwell and Mrs. Gross make full restitution to Armour-Dial. In 1978, Mr. and Mrs. Cadwell were divorced. In his notice of deficiency issued to Mr. and Mrs. Cadwell, the Commissioner determined that they had received unreported "embezzlement" income in the amount of $ 31,622.03 in 1975 and $ 52,185.70 in 1976. Mrs. Cadwell has entered into a settlement with the Internal Revenue Service in which she admitted receiving unreported income of $ 26,779.41 in 1975 and $ 38,101.82 in 1976, and for purposes of this case, Mr. Cadwell has conceded that those amounts were omitted from their joint returns for 1975 and 1976. OPINION In the notice of deficiency issued to Mr. and Mrs. Cadwell, the Commissioner also determined that Mr. Cadwell had received certain unreported compensation, and he disallowed certain deductions claimed by them for travel, entertainment, and sales taxes. In his brief, the petitioner asked for no findings of fact with respect *522 to such issues and presented no arguments in support of his claims; accordingly, we consider that he has conceded those matters. Nevertheless, we have examined the evidence regarding such adjustments, and we find that there is no merit in the petitioner's claims. Thus, we are left to decide only the issue of whether the petitioner is entitled to be relieved of liability for the deficiency as an innocent spouse within the meaning of section 6013(e). Section 6013(e) provides in part: (e) Spouse Relieved of Liability in Certain Cases.-- (1) In general.--Under regulations prescribed by the Secretary, if-- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefitted directly or indirectly from the items omitted from gross income and taking *523 into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income. In order to qualify as an innocent spouse, Mr. Cadwell has the burden of proving that all of the requirements of section 6013(e)(1) have been satisfied. Rule 142(a), Tax Court Rules of Practice and Procedure; Estate of Jackson v. Commissioner,72 T.C. 356, 360 (1979); Sonnenborn v. Commissioner,57 T.C. 373, 380-381 (1971). The parties agree that a joint return was filed, that the 25-percent omission requirement was met, and that the omitted income was attributable to Mrs. Cadwell. However, after considering all the evidence, we are not convinced that Mr. Cadwell has met the requirements of section 6013(e)(1)(B), relating to lack of knowledge of the omission; accordingly, we need not consider whether he satisfies the requirements of section 6013(e)(1)(C), *524 relating to benefit from the omission. To satisfy the requirements of section 6013(e)(1)(B), a spouse must prove both that he did not have actual knowledge of the omission of income and that he did not have reason to know of such omission. Thus, it is not enough for him to show that he lacked actual knowledge of an omission, but he must also show that he had no reason to know of an omission. See Adams v. Commissioner,60 T.C. 300 (1973); Sonnenborn v. Commissioner,supra.To show that he had no reason to know of the omissions, he must convince the Court that a reasonably prudent person with his knowledge of the family finances would not have known of the omission. Sanders v. United States,509 F. 2d 162, 166 (5th Cir. 1975); Estate of Jackson v. Commissioner,72 T.C. at 361. Moreover, "a spouse cannot close * * * [his] eyes to * * * facts, that might give * * * [him] reason to know of the unreported income." Terzian v. Commissioner,72 T.C. 1164, 1170 (1979); Mysse v. Commissioner,57 T.C. 680, 689 (1972). It is clear that Mr. Cadwell failed to meet his burden of *525 proof under section 6013(e) for 1975. For most of 1975, both Mr. and Mrs. Cadwell were employed. Together, they reported a total of $ 17,811.92 of gross income for the year, but their take-home pay was only $ 13,647.86. Their average monthly take-home pay for that year was $ 1,137.32. Yet, during 1975, deposits totaling $ 33,121.71 were made to their joint account. In January 1975, deposits to the joint account totaled $ 1,074.64. In February, deposits suddenly jumped to $ 4,122.72. An examination of the monthly bank statements of such account reveals that both deposits and withdrawals increased markedly, coinciding with Mrs. Cadwell's arrangement with Mr. McQuarry and CII. Mr. Cadwell handled most of the monthly finances, wrote most of the checks, saw the check register, and balanced the checkbook. Thus, he was aware of the money going in and out of the account, and that knowledge, without more, should have caused him to inquire about the source of the additional income. Moreover, in 1975, the Cadwells commenced the improvements on their home and purchased a substantial amount of furniture, two automobiles, and other significant personal items. To pay for all these items *526 was clearly beyond the means of the Cadwells, and their acquisitions should have given Mr. Cadwell additional reason for inquiry. Mrs. Cadwell testified that sometime in 1975 she told her husband that she had an arrangement with Mr. McQuarry under which she was receiving commissions. Particularly, she said that after her husband lost his job and they were having money problems, she revealed that she was receiving additional income; she also said that before they filed their Federal income tax return for 1975, she mentioned the commissions to Mr. Cadwell. In the divorce proceeding, she gave inconsistent testimony, but in view of the other evidence, we are convinced that her testimony in this Court is generally reliable. Mr. Cadwell attempted to explain away his lack of knowledge of the additional income by testifying that he thought that the Grosses were giving them money while he was unemployed and that the home improvements and other items were also gifts from the Grosses. We find such explanation unconvincing. Even if the Grosses made gifts of money to them while he was unemployed, such gifts would not explain the large deposits that commenced well before he became unemployed. *527 In addition, he admitted that he never discussed the claimed gifts with the Grosses. At the time Mr. Cadwell signed the Federal income tax return for 1975, he may not have known of the precise arrangement between his wife and Mr. McQuarry. However, Mrs. Cadwell's claim that she had told him about her commissions, the large bank deposits, and the substantial purchases, all convince us that Mr. Cadwell had reason to believe that his wife was receiving substantial income in excess of that shown on their return for that year. As Mrs. Gross said at the trial: he had to have known something. There was no Santa Claus standing in the corner giving him things. It had to be coming from someplace. Such knowledge is sufficient to prevent him from qualifying under section 6013(e)(1)(B). McCoy v. Commissioner,57 T.C. 732, 734 (1972); see also Altman v. Commissioner,475 F. 2d 876 (2d Cir. 1973), affg. a Memorandum Opinion of this Court; Smith v. Commissioner,70 T.C. 651, 672 (1978). Mr. Cadwell's claim as to lack of knowledge for 1976 is even less convincing. During the first 4 months of that year, he was generally unemployed; *528 yet, during those months, deposits of $ 13,846.57 were made in their joint checking account. While Mrs. Cadwell worked for Armour-Dial in 1976, her average monthly take-home pay was only $ 613.09. According to that average, she received wages of only $ 2,452.36 during that 4-month period. Again, Mr. Cadwell must have been aware of the vast disparity between their income and the deposits in their checking account, and if he did not already know that Mrs. Cadwell was receiving substantial unreported income, surely the time had come for him to seek an explanation. After Mrs. Cadwell was suspended from Armour-Dial in September 1976, Mr. Cadwell accompanied her to various lawyers and was present while her case was discussed. Since she was seeking legal counsel, we assume that in such conferences, she revealed fully the circumstances of the arrangement with Mr. McQuarry. Before Mr. Cadwell signed the return for 1976 in February 1977, a police investigation had begun, and Mrs. Cadwell had been asked for a handwriting exemplar. In view of these circumstances, it is utterly impossible to believe that Mr. Cadwell did not know or have reason to know of the omitted income when he signed *529 their joint return for 1976. Accordingly, we hold that Mr. Cadwell does not qualify as an innocent spouse for either 1975 or 1976. Cf. Sanders v. United States,supra.
Decision will be entered for the respondent.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during 1975 and 1976.↩