T.C. Memo. 2001-78


UNITED STATES TAX COURT


RAYMOND F. KLING AND BARBARA K. KLING, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 3982-98.                          Filed March 30, 2001.


James A. Amodio and Stephen L. Kadish, for petitioners.

Herbert W. Linder, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, Judge:  Respondent determined deficiencies in petitioners' 1991 and 1992 Federal income and self-employment taxes and accuracy-related penalties as follows:

|       |             | Accuracy-Related Penalty |
| Year  | Deficiency  | Sec. 6662(a)             |
| 1991  | [1]$30,573.69 | $6,115                 |
| 1992  | [2]7,729.42   | 1,546                  |

[1]Respondent determined a deficiency of $21,371.69 in Federal income tax and $9,202 in self-employment tax.
[2]Respondent determined a deficiency of $2,389 in Federal income tax, $3,956.42 in self-employment tax, and an earned income credit recapture of $1,384.

The issues for decision are:

(1) Whether petitioners had unreported net income from a sports memorabilia activity in the amounts of $96,350 in 1991 and $28,001 in 1992;

(2) whether petitioners are liable for self-employment tax on the net income from the sports memorabilia activity;

(3) whether petitioners are liable for the accuracy-related penalties under section 6662(a); and

(4) whether petitioner Barbara Kling is eligible for relief under section 6015 with respect to any understatement of tax attributable to the sports memorabilia activity.

FINDINGS OF FACT

A. Background

Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, and the attached exhibits are incorporated herein by this reference.

Petitioners Raymond F. Kling (Raymond) and Barbara K. Kling (Barbara) resided in Cleveland, Ohio, when their petition was

filed. Petitioners have been married to each other for more than 31 years and have four adult children. Although petitioners had saved some money for their children's education, all the children have paid for their own undergraduate and postgraduate schooling. Petitioners purchased their house over 21 years ago for $41,000. At the time of the trial in this case, the house had a value of approximately $60,000 and was subject to a $45,000 mortgage.

For many years, petitioners maintained a joint bank account in both their names at the National City Bank. The account had the same address as their residence, and the monthly bank statements were sent to that address. They closed the National City Bank account in July 1991 and did not maintain a personal checking account for the remainder of 1991 and all of 1992. Eventually Barbara opened an account in her own name.

At the time of the trial in this case, Raymond did not own any other real property, did not own any stocks or bonds, and did not have a pension plan or IRA.

Raymond has collected baseball cards since 1957. He also collects stamps, coins, guns, sports memorabilia, typewriters,[1] movie posters, autographs, and pictures. Every year he takes 1,000 to 2,000 photographs of the Cleveland Indians at spring training. He has more than a million Cleveland Browns programs,

---

[1]Raymond has collected over 600 old typewriters manufactured from the turn of the century to the 1950's. The average cost of a typewriter is $3.75. He has given away three typewriters but has never sold a typewriter.

and 100 Cleveland Indians programs.[2]

Raymond goes to flea markets five or six times a week.  He attends baseball card shows once or twice a month.  Raymond does not have a booth to sell cards at the shows, but he trades, buys, and sells cards at the shows.  Over the years, Raymond created a cash hoard primarily from periodic sales of his memorabilia.

For about 20 years, Raymond has stored most of the items he has collected in part of an old building (the warehouse).  Although Raymond displayed some of his sports cards and collectibles in the front part of the warehouse, most of the items were in disorganized piles.  The warehouse is known as Ohio Hobby Dealers Supply.  Raymond pays $500 per month rent for the warehouse.  In addition to the warehouse, the building also houses a gym, a travel agency, a mission, and a print shop.

Raymond also stores some of his memorabilia in an old church building that he rents from St. Vladimir's.  He began renting with a 3-year option to purchase from St. Vladimir's in 1991 or 1992.  He paid from $200 to $500 per month for rent and $5,000 for the option to purchase.  At the end of the 3-year option period, Raymond did not purchase the building and forfeited the $5,000.

Raymond did not deduct on his income tax returns the rent paid for any site where the items he has collected were stored.

---

[2]Raymond used to clean out Cleveland Stadium.  After every game he would collect all of the unused scorecards and programs.

From 1979 to 1988, Raymond owned a one-third interest in a corporation that owned four video stores.  In 1988, the stores closed because they could not compete with larger video stores such as Blockbuster.

Except for his sports memorabilia activity, Raymond was not otherwise employed from 1988 until 1997.  In 1991, Barbara attended college full time, paying for her schooling with student loans.  She began working as a teacher in May 1992.

In order to supplement their income to cover living expenses incurred from 1990 through 1992, petitioners refinanced their house, maximized their credit card balances, and used money they had saved for their children's educations.  Although some of petitioners' personal expenses were paid out of the National City Bank account, Raymond paid most of petitioners' living expenses with cash.

In 1990, Raymond made a $10,000 profit from an autograph session with Jim Brown.

Raymond bought and sold sports memorabilia, sports memorabilia supplies, and other collectibles during 1991 and 1992.  Raymond did not maintain any books or records (including inventory records) regarding the sales and purchases of these items.

In 1991, Raymond traded baseball cards for an automobile worth $2,000.  In 1992, Raymond paid $1,500 for a motor home and

then sold the motor home a few months later for the same amount.

B.  David J. Morova

Raymond and David J. Morova (Morova) are friends who met through their dealings in sports memorabilia.  Raymond helped Morova start a small retail business called Davey's Cards, Comics, and Collectibles (Davey's Cards).  Raymond and Morova initially intended to operate the store as a partnership. Raymond helped Morova obtain a vendor's permit and tax ID number, stocked the store with hobby supplies, and provided the store with a few video games.  Morova put in his comic book and card collections.  The store opened in late January 1990.  Sometime thereafter, Raymond and Morova agreed that the store would be Morova's alone.

During the first year of operation, Davey's Cards was the only store in the area.  Morova was able to pay the bills and build up his stock.  After the first year, at least four additional stores opened within 2 miles of Davey's Cards.  About the same time, card packs became more expensive. As a result, the business slowly died.  Raymond and Morova agreed that all income from the operation of Davey's Cards belonged to Morova, and Morova reported the income on his Federal income tax returns.

C.  Ameritrust Account

During 1991 and 1992, Raymond and Morova had signature authority over an Ameritrust checking account titled Davys DBA Ohio Hobby Dealers Supply (the Ameritrust account).  Bank statements for the Ameritrust account were mailed to Davey's Cards.  Morova then delivered the statements to Raymond's warehouse.

Raymond was the only person who wrote checks drawn on the Ameritrust account.  Morova did not sign any checks on the Ameritrust account.  Morova did use the Ameritrust account to receive money for credit card sales made by Davey's Cards. Raymond gave Morova supplies in exchange for the amounts deposited into the Ameritrust account from credit card sales at Davey's Cards.  Except for those supplies received from Raymond, Morova did not use the account to pay any expenses from his retail store.

D.  Buyers Group

Raymond and a group of dealers formed a buying group to purchase supplies and merchandise in bulk (the buyers group). Raymond would solicit orders from the other members, place the order with a distributor, and pick up the order.  He usually collected the money from the members of the group as they picked up their portion of the supplies.

Raymond rented space in a building in Hartville, Ohio. Some members of the buying group would pick up their supplies at the Hartville site, because it was closer than the warehouse. One of Raymond's friends, John Lauderdale, bought and sold cards at the Hartville site and took care of the pickups at that site.

Ohio Coin is a wholesale distributor of baseball cards, coin supplies, and related products in the collectible industry. Ohio Coin sells to small distributors, dealers, and to a lesser degree the public. Ohio Coin's prices are 30 percent cheaper than other suppliers in the State. Customers receive an additional 3-percent discount if they pick up a skid[3] of product. To get the 3-percent discount, customers of Ohio Coin, such as Raymond's buyers group, combine orders and then distribute the product among themselves.

The round trip from Ohio Coin to Cleveland was approximately 500 miles. In 1991, instead of spending a whole day to pick up orders from Ohio Coin, Raymond purchased a van for Lewis Miller, an employee of Ohio Coin. The van was titled in Mr. Miller's name, and Mr. Miller was the owner of the van. Mr. Miller used the van to pick up and deliver the items Raymond's group purchased from Ohio Coin. Raymond purchased the van from Cumba Motors for $1,400. A check in the amount of $1,000 drawn on the Ameritrust account was made payable to Cumba Motors. The balance

___

[3]A skid is approximately 4 by 4 feet, and two skids will fill a van.

of the purchase price was made with cash. The vehicle experienced a transmission problem and Raymond paid $450 to Custom Trans, Inc., for the repair.

In about June or July 1992, Raymond purchased products from Ohio Coin. He arranged to pay for the products over time and gave Ohio Coin a series of 10 to 12 checks for $1,296 each to be negotiated on a monthly basis. Beginning in September 1992, the checks did not clear the bank. Ohio Coin accepted most of the products back for about one-half the price.

Ohio Coin sold approximately $40,000 of "screw-downs" to Raymond for $.40 each. The deal for which Raymond bought the screw-downs fell through, and Ohio Coin bought the product back for approximately $.19 each.

E.  Carl Dietz and Megacards

Carl Dietz (Dietz) owns a sports memorabilia shop called Sports of Sorts. Raymond lent Dietz money to purchase photographs. As of September 22, 1990, Dietz owed Raymond $7,300 for amounts Raymond had lent him.

During the summer of 1991, Raymond and Dietz attended a national convention in Anaheim, California. Raymond helped Dietz sell a photograph to Megacards for $50,000. Raymond received $5,000 from the sale.

Raymond sold certain photographs to Megacards for the aggregate amount of $77,000 during 1991. The photographs were owned by Mr. Dietz and a friend of his, Al Gouley. Raymond had lent Mr. Dietz money to purchase the photographs. When Megacards purchased the photographs, it paid the purchase price by a $65,000 wire transfer on December 6, 1991, to the Ameritrust account and by a $12,000 check made payable to Raymond and deposited into the Ameritrust account. Raymond returned $10,000 of the purchase price to either Steve Juskewycz[4] or Megacards. Raymond also paid Mr. Dietz $19,775. Raymond made a commission on the sale.

## F. Frank's Wholesale

In January 1991, Raymond sold memorabilia known as baseball gross-outs and awesome all-stars for $23,000 to Frank's Wholesale, owned by Frank Sustar (Sustar). Sustar gave Raymond $9,189 in cash, and the cash was put in a paper bag. On January 14, 1991, Barbara deposited the cash into petitioners' National City Bank account at Raymond's request. Raymond also deposited checks from Frank's Wholesale totaling $15,608.01 into the Ameritrust and National City Bank accounts.

---

[4]Steve Juskewycz was the owner or president of Megacards.

G.  Sales From Raymond's Private Collection

1.  James Amodio

James Amodio purchased sports memorabilia and other collectibles from Raymond during the years at issue.  Two checks signed by James Amodio made payable to Raymond in the amounts of $145 and $152.75 were deposited into the Ameritrust account on May 20, 1991, and December 6, 1991, respectively.

2.  John Cadier

In 1991, Raymond sold a baseball card to John Cadier for $200.  The purchase price was deposited into the Ameritrust account.

3.  Robert Koehler

In 1991, Raymond sold baseball photos to Robert Koehler for $400.  The purchase price was deposited into the Ameritrust account.

4.  Thomas Jurcak

In 1991, Raymond sold a baseball to Thomas Jurcak for $48. The $48 was deposited into the Ameritrust account.

H.  Petitioners' 1991 and 1992 Federal Income Tax Returns

Petitioners filed their joint Federal income tax returns for the taxable years 1991 and 1992.  On their 1991 return, petitioners reported total income of $18,000.  On Schedule D, Capital Gains and Losses, of the 1991 return, petitioners reported gain from two sales of photos.  They reported $5,000

gain from a July 1, 1991, sale of a photo with zero basis for $5,000, and a December 4, 1991, sale of photos acquired on December 1, 1991, with zero basis for $13,000.

On their 1992 return, petitioners reported total income of $9,677.75. They reported $4,624 of Form 1099-MISC income from Topps Co., $5,032.32 from Barbara's Form W-2 income from teaching, and $21.43 of interest income.

## I. Reconstruction of Income

An internal revenue agent of the Internal Revenue Service audited petitioners' 1991, 1992, and 1993 returns. The agent reconstructed petitioners' income using the bank deposits method.

## 1. 1991 Income

## a. Ameritrust Account

In 1991, gross deposits of $404,747.80 were deposited into the Ameritrust account. Of that amount, $15,295.09 was attributable to sales paid by credit card at Davey's Cards in exchange for which Morova received $15,295.09 of supplies from Raymond. Additionally, there were $6,058.82 in miscellaneous bank charges, lease payments on the credit card machine used by Davey's Card, and charges for deposited items returned for insufficient funds.

Checks written and paid on the Ameritrust account for which respondent allowed a deduction for purchases made during 1991 were as follows:

| Payee | Amount |
|-------|--------|
| Lawrence Machine | $23,156.75 |
| Midwest Sport Cards | 4,937.50 |
| Sport Design Products | 23,269.18 |
| Tuff Stuff | 1,757.05 |
| Ohio Coin | 104,300.37 |
| Edgewater Book | 2,219.01 |
| Matthew Zechman Co. | 15,734.35 |
| Matthew Zechman | 5,067.00 |
| Good Deal | 1,200.00 |
| River City Traders | 418.00 |
| CJ's Extra Inning | 9,122.50 |
| Ultra Media Corp. | 313.69 |
| Unique Vinyl | 3,156.00 |
| Extra Base Sports | 1,300.00 |
| B & O Wholesale | 610.00 |
| F.A.F.C. | 2,158.00 |
| Baseline | 405.00 |
| B & B Sports Cards | 435.00 |
| Chris' Cards | 1,200.00 |
| John Lauderdale | 10,577.00 |
| Ron Shedlock | 30,825.00 |
| Beckett | 4,166.00 |
| Myron Swirynsky | 540.00 |
| Ameritrust[1] | 12,000.00 |
| Don Gries | 15,525.00 |
| Steve Levine | 790.00 |
| David Morova | 1,800.00 |
| Tom Dyschuk | 1,080.00 |
| Eric Lawrence | 350.00 |
| Joey Eacobacci | 2,430.00 |
| Jim Stepanik | 460.00 |
| Stefan Juskewycz Co. | 15,662.96 |
| Cash[2] | 1,900.00 |
| Cash[3] | 2,000.00 |
| Cash[4] | 300.00 |
| Cash[5] | 200.00 |

[1]"Ohio Coin" indicated on memo section of check.
[2]Two checks payable to cash were negotiated by Franks Wholesale.
[3]Check negotiated by Dave Morova.
[4]Check negotiated by Richard Cook.
[5]Check negotiated by John Lauderdale.

Respondent allowed deductions as rent expenses paid during 1991 for checks written and paid on the Ameritrust account as follows:

| Payee | Expense | Amount |
|-------|---------|--------|
| St. Vladimirs | Rent | $5,000 |
| Edith Rosch | Rent | 1,000 |

Respondent did not allow any deductions for the following additional amounts paid from the Ameritrust account in 1991:

| Payee | Amount |
|-------|--------|
| Debra Bradley | $27,175.00 |
| Raymond | 10,013.00 |
| Bob Kelly | 500.00 |
| Ray Duffy | 150.00 |
| Fred Pachasa | 450.00 |
| O.U.P.A.[1] | 300.00 |
| Jim Mitchell | 4,000.00 |
| Maintenance Engineering, Ltd. | 177.93 |
| Anna Fox | 1,077.00 |
| Dan Eberhardt | 240.00 |
| James Brznack | 60.50 |
| Jennifer Kling | 933.78 |
| Wade Carsel | 100.00 |
| Carl Dietz | 19,775.00 |
| Cash[2] | 1,200.00 |
| Cash[3] | 2,500.00 |
| Cash[2] | 1,500.00 |
| John Pepera | 375.00 |
| Thomas J. Bowers[4] | 1,260.00 |
| Cash[2] | 120.00 |

[1]Ohio Union of Patrolman's Association.
[2]"Commons" indicated on memo section of check.
[3]"Sam's Club" indicated on memo.
[4]"Desert Storm" indicated on memo.

## b. National City Bank Account

From January 1991 until the account was closed in July 1991, gross deposits of $59,198.55 were deposited into the National

City Bank account.  Of that amount, $2,600 was transferred by check from the Ameritrust account and $18.50 represents amount received as gifts.

In 1991, the following amounts were paid from the National City Bank account for petitioners' personal expenses:

| Payee | Amount |
|---|---|
| C.P.P.A.[1] | $288.00 |
| Student Travel Service | 184.00 |
| West American Insurance Co. | 213.00 |
| East Ohio Gas | 55.00 |
| Old Brooklyn Youth League | 15.00 |
| Tom Ballog | 100.00 |
| Trinity High School | 25.00 |
| College-level Exam. Program | 38.00 |
| Oriental Trading Co. | 12.60 |
| Lake Erie Girl Scout Council | 24.00 |
| Internal Revenue Service | 92.00 |
| Treasure of State of Ohio | 84.14 |
| Central Collection Agency | 257.96 |
| College Scholarship Service | 26.25 |
| Our Lady of Good Counsel | 50.00 |
| Cleveland Public Power | 116.67 |

[1]Cleveland Patrolmen's Association.

Checks written and paid on the National City Bank account for which respondent allowed a deduction for purchases made during 1991 were as follows:

| Payee | Amount |
|---|---|
| M. Zechman | 690 |
| Midwest Sports Cards | 375 |
| Jim Beckett | 166 |
| Lawrence Machine | 3,375 |
| Ron Shedlock | 8,472 |
| Ohio Coin | 26,502 |
| Gateway Cards | 756 |
| Beckett | 1,419 |

The following additional amounts were paid from the National City Bank account in 1991:

| Payee | Amount |
|-------|--------|
| Bob Kelly | $164.00 |
| Jim Wilson | 200.00 |
| First Card | 200.00 |
| Manufacturers Hanover | 221.00 |
| Evelyn Johanson | 1,614.00 |
| Wholesale Club | 3,000.00 |
| Sam's Club | 1,874.15 |
| Cash | $1,600.00 |

During 1991, miscellaneous bank charges and returned check fees of $269.65 were debited/charged against the National City Bank account.

c. IRS Determination for 1991

The internal revenue agent determined Raymond's gross income from the sale of sports memorabilia and supplies for 1991 as follows:

| | |
|---|---|
| Ameritrust deposits | $404,748 |
| Less misc. expenses | (5,763) |
| National City Bank deposits | 59,199 |
| Less misc. expenses | (2,600) |
| Total | 455,584 |

The agent further determined that petitioners' 1991 income should be increased by $91,749 computed as follows:

| | |
|---|---|
| Gross receipts | $455,584 |
| Purchases | (353,234) |
| Rent | (6,000) |
| Self-employment tax adjustment | (4,601) |
| Total | 91,749 |

## 2. 1992

### a. Ameritrust/Star Bank Account

During the first 6 months of 1992, gross deposits of $77,482 were deposited into the Ameritrust account. Miscellaneous bank charges and deposited items returned for insufficient funds totaling $2,996.33 were charged to the Ameritrust account in 1992. During 1992, a total of $1,186.40 attributable to credit card purchases from Davey's Cards was directly deposited into the Ameritrust account. Morova received $1,186.40 of merchandise from Raymond in exchange for the deposits from the credit card sales.

Sometime in June 1992, Ameritrust was acquired by Star Bank, and the Ameritrust account became the Star Bank account. In the latter part of 1992, gross deposits of $17,424 were deposited into the Star Bank account.

Respondent allowed a deduction for purchases for checks written and paid on the Ameritrust/Star Bank account during 1992 as follows:

| Payee | Amount |
|---|---|
| Ohio Coin[1] | $24,251.00 |
| Ohio Coin | 2,946.00 |
| Ron Shedlock[2] | 7,340.00 |
| Megacards | 4,000.00 |
| Master Printing Co. | 3,157.00 |
| Pro Sport | 2,900.00 |
| Lawrence Machine | 1,700.00 |
| Unique Vinyl | 1,811.10 |
| Premier Sportscards | 866.48 |

[1]Of the amount paid to Ohio Coin, checks totaling $5,184 were dishonored and should not be included in purchases paid in 1992.
[2]Of the amount paid to Ron Shedlock, checks totaling $10,000 were dishonored and should not be included in the purchases paid in 1992.

Respondent allowed a deduction for rental expenses for checks written and paid on the Ameritrust/Star Bank account during 1992 as follows:

| Payee | Expense | Amount |
|-------|---------|--------|
| St. Vladimirs | Rent | $2,000 |
| Edith Rosch | Rent | 3,000 |

The following additional amounts were paid from the Ameritrust/Star Bank account in 1992:

| Payee | Amount |
|-------|--------|
| Barbara Kling | $750 |
| CCPL[1] | 836 |
| John Banville | 600 |
| Custom Tran. Inc.[2] | 450 |
| Eric Lawrence | 1,035 |
| Bill Clay | 1,228 |
| Raymond | 5,000 |
| Cash | 3,400 |
| John Houlihan | 26,014 |
| David Houlihan | 4,000 |

[1]Cuyahoga County Public Library
[2]Repair of vehicle Raymond purchased from Cumba Motors in 1991.

Because of insufficient funds, checks written or presented for payment after August 31, 1992, on the Ameritrust/Star Bank account were not honored. Miscellaneous bank charges and returned check fees of $885.86 were debited/charged against the Star Bank account during 1992.

b.  IRS Determination for 1992

The internal revenue agent determined petitioners' gross income from Raymond's sale of sports memorabilia and supplies for 1992 as follows:

| | |
|---|---|
| Ameritrust deposits | $77,482 |
| Less misc. expenses | (2,934) |
| Star Bank deposits | 17,424 |
| Total | 91,972 |

The agent did not reduce the gross income to reflect the $885.86 miscellaneous expenses from the Star Bank account.

The agent determined that petitioners' 1992 income should be increased by $26,023 computed as follows:

| | |
|---|---|
| Gross receipts | $91,972 |
| Purchases | (58,971) |
| Rent | (5,000) |
| Self-employment tax adjustment | (1,978) |
| Total | 26,023 |

Of the $58,971 allowed for purchases, checks totaling $18,130 were dishonored due to insufficient funds.

J.  Barbara Kling

Barbara knew that Raymond bought and sold sports memorabilia during the years at issue, that he stored the memorabilia at the warehouse and at St Vladimir's, and that he maintained the Ameritrust and Star Bank accounts.

OPINION

Issue 1.  Whether Petitioners Had Unreported Net Income From a Sports Memorabilia Activity in the Amounts of $96,350 in 1991 and $28,001 in 1992

Gross income includes income derived from business.  See sec. 61(a)(2).  Gross income is construed broadly to include all "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion."  Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955); Hawkins v. United States, 30 F.3d 1077, 1079 (9th Cir. 1994).  Every person subject to income tax is required to keep books and records that establish the amount of gross income and deductions shown by that person on his or her income tax return.  See sec. 6001;  sec. 1.6001-1(a), Income Tax Regs.

When a taxpayer fails to keep adequate records, the Commissioner is authorized to determine the existence and amount of the taxpayer's income by any method that clearly reflects income.  See sec. 446(b); Holland v. United States, 348 U.S. 121 (1954); Mallette Bros. Constr. Co. v. United States, 695 F.2d 145, 148 (5th Cir. 1983); Webb v. Commissioner, 394 F.2d 366, 371-372 (5th Cir. 1968), affg. T.C. Memo. 1966-81.  The reconstruction of income need only be reasonable in light of all surrounding facts and circumstances.  See Palmer v. IRS, 116 F.3d 1309, 1312 (9th Cir. 1997); Giddio v. Commissioner, 54 T.C. 1530, 1533-1534 (1970); Schroeder v. Commissioner, 40 T.C. 30, 33

(1963). The Commissioner has latitude in determining which method of reconstruction to apply when taxpayers fail to maintain adequate records. See <u>Petzoldt v. Commissioner</u>, 92 T.C. 661, 693 (1989). Once the Commissioner has reconstructed a taxpayer's income, the burden is on the taxpayer to demonstrate that the Commissioner's determination is excessive. See <u>Mallette Bros. Constr. Co. v. United States</u>, <u>supra</u>; <u>Giddio v. Commissioner</u>, <u>supra</u> at 1534.

The records maintained by petitioners are insufficient to permit an accurate computation of their income tax liability for the years in issue. Respondent reconstructed petitioners' income using the bank deposits method. The bank deposits method is an accepted method of income reconstruction when a taxpayer has inadequate books and records and large bank deposits. See <u>DiLeo v. Commissioner</u>, 96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992); <u>Parks v. Commissioner</u>, 94 T.C. 654, 658 (1990); <u>Nicholas v. Commissioner</u>, 70 T.C. 1057, 1065 (1978); <u>Estate of Mason v. Commissioner</u>, 64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977).

In a bank deposits reconstruction of the taxpayer's income, the Commissioner's agents review and analyze the taxpayer's bank records for the years in issue. Bank deposits are prima facie evidence of income. See <u>Clayton v. Commissioner</u>, 102 T.C. 632, 645 (1994). Absent some explanation, a taxpayer's bank deposits

represent taxable income. The total of all deposits is determined by the Commissioner for each year in question to arrive at the taxpayer's gross income. An adjustment is then made to eliminate deposits that reflect nonincome items such as gifts, loans, and transfers between the taxpayer's various bank accounts. The Commissioner will also make a further adjustment for the taxpayer's ascertainable business expenses, deductions, and exemptions. See Percifield v. United States, 241 F.2d 225 (9th Cir. 1957).

Where respondent has employed the bank deposits method in his determination of the deficiencies, the burden of proof rests with petitioners to show that such determination is erroneous. See Rule 142(a); Estate of Mason v. Commissioner, supra at 657; Harper v. Commissioner, 54 T.C. 1121, 1129 (1970). Respondent need not prove a likely source for the unreported income. See Estate of Mason v. Commissioner, supra. Nor is he required to prove that all deposits constitute taxable income. See Gemma v. Commissioner, 46 T.C. 821, 833 (1966).

The taxpayer has the burden of proving that the bank deposits came from a nontaxable source. See Rule 142(a); Clayton v. Commissioner, supra; Estate of Mason v. Commissioner, supra; Sproul v. Commissioner, T.C. Memo. 1995-207. Additionally, the taxpayer bears the burden of proof in substantiating claimed deductions. See Patton v. Commissioner, 799 F.2d 166, 170 (5th

Cir. 1986), affg. T.C. Memo. 1985-148; <u>C.A. White Trucking Co. v. Commissioner</u>, 601 F.2d 867, 869 (5th Cir. 1979), affg. T.C. Memo. 1977-6. Therefore, petitioners were required to substantiate claimed deductions for cost of goods sold in excess of the amount respondent allowed. See, e.g., <u>Manning v. Commissioner</u>, T.C. Memo. 1995-408; <u>Wright v. Commissioner</u>, T.C. Memo. 1993-27; <u>Danner v. Commissioner</u>, T.C. Memo. 1992-385; <u>Chagra v. Commissioner</u>, T.C. Memo. 1991-366, affd. without opinion 990 F.2d 1250 (2d Cir. 1993).

## A. Petitioners' Initial Arguments

Petitioners argue that Raymond did not make any profit from his activity. They assert that the members of the buyers group paid the same amount for the supplies that Raymond had paid to acquire the goods. Respondent's agent confirmed that Raymond sold the goods to the buyers group at cost.

Petitioners argue that since Raymond did not make a profit from the buyers group activity, there was no income omitted on their returns. The flaw with petitioners' argument, however, is that Raymond used the checking accounts for other transactions besides the buyers group purchasing activity. For example, although the transaction with Dietz and Megacards was unrelated to the bulk buying for the buyers group, Raymond deposited the payment from Megacards into and paid Dietz from the Ameritrust account. It is also apparent to the Court that Raymond used the

accounts for transactions related to his private collection.

Raymond attended flea markets five or six times a week and baseball card shows once or twice a month. He traded, bought, and sold cards at the shows. Because he often used the money from sales to purchase other items, Raymond erroneously believed that he did not have taxable income from this activity. Thus, petitioners did not report any income from sales related to Raymond's private collection.

Petitioners next argue that they had no taxable income because, applying factors set forth under section 183, Raymond did not engage in the activity for profit. Petitioners misinterpret section 183, for although that section limits the amount a taxpayer may deduct from an activity if that activity is not engaged in for profit, there is nothing in section 183 that excludes from income profits earned from such activity.

B. Reduction of Gross Receipts for Cash Hoard

Respondent determined that petitioners had gross receipts from Raymond's sports memorabilia activity, including the bulk purchasing activity for the buyers group, totaling $455,584 in 1991 and $91,972 in 1992. Petitioners assert that respondent should have reduced the amount each year to reflect money from a cash hoard that Raymond deposited into the Ameritrust account.

Over the years, Raymond created a cash hoard primarily from periodic sales of his memorabilia. He claims the cash hoard was

as follows from 1978 to 1993:

| Year | Year-end Balance | Net Increase/ (Decrease) |
|---|---|---|
| 1978 | $1,500 | $1,500 |
| 1979 | 2,500 | 1,000 |
| 1980[1] | 41,500 | 39,000 |
| 1981 | 44,300 | 2,800 |
| 1982 | 50,300 | 6,000 |
| 1983 | 53,550 | 3,250 |
| 1984 | 62,950 | 9,350 |
| 1985 | 70,550 | 7,600 |
| 1986 | 83,050 | 12,400 |
| 1987 | 75,000 | (8,050) |
| 1988 | 70,000 | (5,000) |
| 1989 | 55,000 | (15,000) |
| 1990 | 40,000 | (15,000) |
| 1991 | 25,000 | (15,000) |
| 1992 | 10,000 | (15,000) |
| 1993 | -0- | (10,000) |

[1]In 1980, Raymond sold a coin collection.

Although we have found that Raymond in fact had a cash hoard, we need not decide for present purposes the amount of the hoard, because the amount of omitted income should not be reduced by the amount of the hoard. In reconstructing petitioners' income, respondent did not include the amount of cash expenditures made by petitioners during the years at issue. Furthermore, except for specific cash deposits that Raymond made into the Ameritrust account to cover bounced checks, discussed below, there is no evidence that deposits into the bank accounts were made from the cash hoard. Therefore, we find that the income determined by respondent should not be reduced to reflect a diminution in any cash hoard that Raymond might have had.

C.  Reduction of Gross Receipts for Loans

On several occasions Raymond deposited his own cash into the Ameritrust account to cover checks written on the account that had been dishonored because the account had insufficient funds to cover the amount of the checks.  He claims that those cash deposits were in effect loans to the buyers group and that certain checks payable to cash or to himself from the Ameritrust account were repayments of those loans.

Raymond claims that the following cash deposits represent loans he made to the buyers group and the checks payable to himself or cash represent the repayment of the loans:

|  |  | Loan |  |
| Date | Cash Deposit | Repayment/Payee |  |
| 01/14/1991 | $950 | -- |  |
| 01/14/1991 | 1,050 | -- |  |
| 01/29/1991 | 2,520 | -- |  |
| 02/04/1991 | 1,200 | -- |  |
| 02/08/1991 | 1,500 | -- |  |
| 03/25/1991 | -- | $2,000 | Cash |
| 03/27/1991 | -- | 2,500 | Cash |
| 04/02/1991 | 1,000 | -- |  |
| 05/02/1991 | 1,000 | -- |  |
| 05/02/1991 | 2,000 | -- |  |
| 07/17/1991 | -- | 1,240 | Raymond |
| 07/24/1991 | -- | 1,000 | Cash |
| 08/27/1991 | 100 |  |  |
| 10/03/1991 | -- | 1,500 | Cash |
| 11/04/1991 | -- | 900 | Cash |
| 12/10/1991 | -- | 1,200 | Cash |
| 04/13/1992 | -- | 1,000 | Cash |
| Total | 11,320 | 11,340 |  |

The bank records show that shortly before each of the above cash deposits was made, a fee had been charged for one or more

checks dishonored because of insufficient funds. Those records also show that at the time the checks at issue were written to cash or Raymond for repayment the account had ample funds. We find it is more likely than not that the cash deposits were loans that Raymond made to the buyers group to cover checks that had been dishonored for insufficient funds, and the checks payable to cash and to Raymond represent repayment of those loans. Therefore, we find that the gross receipts for 1991 should be reduced by $11,320.

D. Adjustments for Deposits and Checks Related to Houlihan/Roth Transaction

Petitioners also claim that in 1991 Raymond was involved in a transaction between his friend John Houlihan (John), John's brother Dave Houlihan (Dave), Jeff Roth (Jeff), and Jeff's girlfriend Debra Bradley (Debra). Petitioners claim that as a result of that transaction the gross receipts for 1991 should be reduced by $27,175 or, in the alternative, the cost of goods sold should be increased by that amount. John owns two shops in the Boston area.

Petitioners claim that cash deposited into the Ameritrust account belonged to John (totaling $23,075) and Dave (totaling $4,000), and the checks written to Debra (totaling $27,175), John (totaling $26,014), and Dave (totaling $4,000) are part of the same transaction as follows:

|  | Deposits | | Withdrawals | |
| Date | Amount | Source | Amount | Payee |
| 06/19/1991 | $7,000 | John | -- | |
| 08/08/1991 | 800 | John | -- | |
| 08/09/1991 | -- | | $4,000 | Debra |
| 08/11/1991 | -- | | 4,000 | Debra |
| 08/16/1991 | -- | | 4,000 | Debra |
| 08/20/1991 | -- | | 2,075 | Debra |
| 08/20/1991 | -- | | 2,600 | Debra |
| 08/22/1991 | 500 | John | -- | |
| 08/22/1991 | 1,500 | John | -- | |
| 08/23/1991 | -- | | 3,500 | Debra |
| 08/26/1991 | 475 | John | -- | |
| 08/26/1991 | 1,300 | John | -- | |
| 09/10/1991 | 3,000 | John | -- | |
| 09/11/1991 | 900 | John | -- | |
| 09/13/1991 | 400 | John | -- | |
| 09/23/1991 | 200 | John | - | |
| 09/23/1991 | 400 | John | -- | |
| 09/23/1991 | 1,500 | John | -- | |
| 09/24/1991 | -- | | 7,000 | Debra |
| 10/01/1991 | 500 | John | -- | |
| 10/15/1991 | 1,700 | John | -- | |
| 10/15/1991 | 2,900 | John | -- | |
| 10/25/1991 | 4,000 | Dave | -- | |
| 02/22/1992 | -- | | 5,000 | John |
| 03/13/1992 | -- | | 4,200 | John |
| 04/04/1992 | -- | | 5,850 | John |
| 04/29/1992 | -- | | 3,464 | John |
| 05/03/1992 | -- | | 1,000 | John |
| 05/21/1992 | -- | | 3,500 | John |
| 06/22/1992 | -- | | 1,000 | Dave |
| 07/23/1992 | -- | | 1,000 | Dave |
| 07/23/1992 | -- | | 1,000 | Dave |
| 08/17/1992 | -- | | 1,000 | John |
| 08/17/1992 | -- | | 1,000 | John |
| 08/17/1992 | -- | | 1,000 | John |
| 09/04/1992 | -- | | 1,000 | Dave |

Raymond explains the deposits and withdrawals as follows: John and Dave wanted to purchase a type of card called Uncut Sheets from Jeff Roth; John and Dave gave Raymond cash, Raymond deposited the cash into the Ameritrust account, and Raymond sent

a series of checks totaling $27,175 to Debra for John and Dave's orders; Raymond also ordered some of the sheets and paid for the purchase by wire transfer; Jeff, however, did not send the sheets that John, Dave, and Raymond had ordered; it took Raymond several months to get the money back; Raymond received cash and some merchandise from Jeff; as Raymond received the money from Jeff, he deposited the cash into his Ameritrust account, and then he sent the money to John and Dave; Raymond sold some of the merchandise he received from Roth for $4,200 and sent a check to John for $4,200.

Although petitioners' pretrial memorandum indicates that they would call John to testify as a witness, petitioners failed to bring a single witness to corroborate Raymond's story. Thus, petitioners failed to carry their burden of proving that these funds represent items that should not be included in their income.

E. Adjustments for Purchases/Cost of Goods Sold or Expenses

Respondent allowed petitioners a deduction of $353,234 in 1991 and $58,971 in 1992 for purchases or cost of goods sold. Respondent also allowed a deduction for rental expense of $6,000 in 1991 and $5,000 in 1992 Petitioners claim that the deductions for purchases and expenses should be increased for additional amounts.

Respondent did not explain the basis or standard used to determine whether a given item would be included in the purchases for which a deduction was allowed in 1991 or 1992. The agent did not attempt to account for beginning and ending year inventories. It appears to the Court, however, that the agent, having confirmed that the goods acquired for the buyers group were distributed to the members at cost, allowed a deduction for items identified as purchases made for the buyers group. Consistent with that determination, we shall allow a deduction for purchases made for the buyers group. Additionally, we shall allow a deduction for payments unrelated to the buyers group but attributable to sales or transactions completed during the taxable year at issue.

1.  Klein News

Klein News is a distributor of magazines. In 1990, Raymond agreed to provide metal racks to hold plastic pages, sleeves, and hard plastic for sports cards for Klein News. Klein News agreed to purchase between $20,000 and $25,000 worth of merchandise per month. On December 26, 1990, Raymond wrote a check in the amount of $24,048.85 made payable to Ohio Coin for payment of merchandise bought from Ohio Coin related to the deal with Klein News. In 1991, Raymond sold merchandise to Klein News for $23,987.46, the payment for which was deposited into the Ameritrust account on February 1, 1991.

Respondent did not allow a deduction in 1991 for the cost of the merchandise purchased from Ohio Coin.  Since the merchandise was sold in 1991 as part of the Klein News arrangement, the cost of goods sold for 1991 should be increased by $24,048.85.

## 2.  Additional Checks Written in 1991 on the Ameritrust and National City Bank Accounts

Petitioners claim that the deductions for purchases and expenses should be increased for the following amounts paid from the Ameritrust and National City Bank accounts in 1991 as follows:

### Ameritrust Account

| Payee | Amount |
| --- | --- |
| Raymond | $8,773.00 |
| Bob Kelly | 500.00 |
| Ray Duffy | 150.00 |
| Fred Pachasa | 450.00 |
| O.U.P.A.[1] | 300.00 |
| Jim Mitchell | 4,000.00 |
| Maintenance Engineering, Ltd. | 177.93 |
| Anna Fox | 1,077.00 |
| Dan Eberhardt | 240.00 |
| James Brznack | 60.50 |
| Jennifer Kling | 933.78 |
| Wade Carsel | 100.00 |
| Carl Dietz | 19,775.00 |
| Cash | 1,200.00 |
| Cash | 2,500.00 |
| Cash | 1,500.00 |
| John Pepera | 375.00 |
| Thomas J. Bowers | 1,260.00 |
| Cash | 120.00 |

[1]Ohio Union of Patrolman's Association.

National City Bank Account

| Payee | Amount |
| --- | --- |
| Bob Kelly | $164.00 |
| Jim Wilson | 200.00 |
| Evelyn Johanson | 1,614.00 |
| Wholesale Club | 3,000.00 |
| Sam's Club | 1,874.15 |
| Cash | 1,600.00 |

The following discussion relates to the items listed above that were withdrawn from the Ameritrust and National City Bank accounts in 1991.

a. Raymond

A check dated May 30, 1991, written on the Ameritrust account is made payable to Raymond in the amount of $3,173. "E&J Sales" is written on the memo section of the check. The record also shows that a check from E&J Sales made payable to Raymond was deposited into the Ameritrust account on May 30, 1991. Petitioners assert that cost of goods sold in 1991 should be increased to reflect the purchase of the goods for E&J Sales.

Raymond explains the check as follows: E&J Sales is a company that sells wholesale; E&J Sales asked Raymond to purchase some merchandise for the company in California and delivered a check in the amount of $3,173 made payable to Raymond; Raymond knew the California company would not accept a third party check; therefore, he deposited the check from E&J Sales into the Ameritrust account and wrote a check to himself in the same amount to pay for the merchandise.

Petitioners did not produce a receipt for any goods purchased for E&J Sales. Additionally, the check written on the Ameritrust account made payable to Raymond was endorsed only by Raymond and not by any other party. Petitioners failed to bring a single witness to corroborate Raymond's story. In failing to do so, petitioners failed to carry their burden of proving that these funds represent items that should be included in the cost of goods sold for 1991.

Petitioners claim that the remaining three checks written to Raymond ($2,600 written on January 7, 1991, $2,000 written on July 3, 1991, and $1,000 written on October 31, 1991) were to distribute profits from the sale of the pictures the gain from which Raymond reported on his return.

On Schedule D of their 1991 return, petitioners reported gain from two sales of photos. They reported a $5,000 gain from a July 1, 1991, sale of a photo with zero basis, and a $13,000 gain from a December 4, 1991, sale of photos acquired on December 1, 1991, with zero basis. The checks made payable to Raymond do not coincide with the sales of the photographs reported on the 1991 return. Furthermore, we have examined the bank records for the periods around the time of the sales. There is no evidence that $5,000 was deposited into the account on or around July 1, 1991, or that $13,000 was deposited into the account around December 4, 1991. Petitioners have not established that the

income as determined by respondent for 1991 should be reduced by the amounts of these checks.

b. Bob Kelly

Bob Kelly is a small card dealer. The $500 check paid to Mr. Kelly was for the purchase of cards. We find that the purchase of the $500 of cards was more likely than not a purchase for Raymond's private collection, rather than a bulk purchase for the buyers group. Petitioners have not shown that the cards purchased were sold during 1991 or 1992. Therefore, petitioners' income is not reduced by $500.

c. Ray Duffy

Ray Duffy is an autograph promoter. The $150 check paid to Mr. Duffy was for the purchase of autographed pictures. We find that the purchase of the autographed pictures more likely than not was a purchase for Raymond's private collection, rather than a bulk purchase for the buyers group. Petitioners have not shown that the autographed pictures purchased from Mr. Duffy were sold, and that the proceeds from that sale were deposited into their accounts during 1991 or 1992. Therefore, petitioners' income for 1991 or 1992 is not reduced by $150.

d. O.U.P.A.

Raymond claims that the $300 check written to the Ohio Union of Patrolman's Association was for an advertisement placed in the police association's yearly fund raiser book for Davey's Cards.

Petitioners did not provide a copy of the ad and did not ask Morova to substantiate the expense. Petitioners failed to provide any evidence to corroborate that the $300 check was for an advertisement. Therefore, petitioners' income is not reduced by $300.

e. Jim Mitchell

Jim Mitchell operates Ontario Hobby Dealers Supply. The $4,000 check paid to Mr. Mitchell was for the purchase of "close-outs". We find that the purchase of $4,000 worth of close-outs more likely than not was a purchase for the buyers group. Therefore, the cost of goods sold for 1991 should be increased by $4,000.

f. Anna Fox

Raymond claims that the $1,077 check written to Anna Fox was for a purchase of a baseball signed by Babe Ruth, Lou Gehrig, Ty Cobb, and Colonel Jacobs for Davey's Cards. He further claims that the ball was stolen, and Morova did not pay Raymond for the ball.

Although Morova testified at trial, he was never questioned about the baseball. Petitioners have failed to substantiate that the cost of goods sold should be increased for the $1,077 paid to Anna Fox.

g.  Dan Eberhardt

Dan Eberhardt is a dealer.  The $240 check paid to Mr. Eberhardt was for the purchase of a wax case.[5]  We find that the $240 purchase of a wax case more likely than not was a purchase for Raymond's private collection, rather than a bulk purchase for the buyers group.  Petitioners have not shown that the wax case purchased was sold during 1991 or 1992.  Therefore, the cost of goods sold is not increased by the cost of the cards.

h.  Jennifer Kling's Star Wars Collection

A check in the amount of $933.78 written on the Ameritrust account was made payable to petitioners' daughter, Jennifer Kling.

Raymond claims that Jennifer collected Star Wars cards when she was in grade school and high school and, in 1991, she sold the collection to one of Morova's customers.  He further claims that the purchase price of $933.78 was deposited into the Ameritrust account.  Raymond then wrote a check dated July 29, 1991, from that account payable to Jennifer in the amount of

---

[5]Originally, baseball cards came as a premium with bubble gum wrapped in a little wax pack (like wax paper around the card) that were heat sealed.  Eventually, the baseball cards became so popular that the bubble gum wrap became the premium with the purchase of the baseball cards, and finally the bubble gum was eliminated.  Although the packs are now polypacks, collectors still refer to them as wax.  Today, baseball cards generally are marketed in one of three ways--wax, cellos, and rack packs.  A wax pack is the smallest, generally containing 1 to 15 cards.  A rack pack generally consists of 3 wax packs and a cello pack would be a larger pack containing 4 times as many cards and selling for $3 to $4.

$933.78. Jennifer did not testify at trial in this case. Although Barbara testified, she did not address the sale of Jennifer's collection or even confirm that Jennifer ever had such a collection. Petitioners did not ask Morova about the sale when he testified at trial. Petitioners have not established that the check to Jennifer was a distribution of proceeds from the sale of her collection or that the $933.78 payment is otherwise deductible in 1991.

i. Wade Carsel

Wade Carsel is a dealer whose company is named Box Man. Petitioners have not provided any evidence regarding the $100 check paid to Mr. Carsel. Therefore, petitioners' income is not reduced by $100.

j. Carl Dietz

The $19,775 check paid to Dietz is the money from the Megacards deal that Raymond distributed to Dietz. The sale was made in 1991, and the proceeds from the sale were deposited into the Ameritrust account. Therefore, petitioners' income for 1991 will be reduced by $19,775.

k. Cash

Dave Cirino (Cirino) is a dealer who bought large wax boxes, sorted out the stars, and then sold the commons.[6] The checks payable to cash in the amounts of $1,200 and $120 are for commons

---

[6]The term "commons" refers to baseball card that feature a player who is not considered a star.

purchased from Cirino.  We find that the $1,200 purchase of the commons more likely than not was a bulk purchase for the buyers group, rather than for Raymond's private collection.  Therefore, the purchases for 1991 is increased by $1,200.  We cannot say, however, that the $120 purchase of the commons was more likely than not a purchase for the buyers group, rather than for Raymond's private collection.  Petitioners have not shown that the commons purchased for $120 from Cirino were sold and the proceeds from that sale were deposited into their accounts during 1991 or 1992.  Therefore, petitioners have not established that they are entitled to deduct the $120 in either 1991 or 1992.

l.  John Pepera

John Pepera (Pepera) is a district manager for a newspaper called the Cleveland Plain Dealer.  The $375 check paid to Pepera was for the purchase of a large number of newspapers for a special event relating to sports.  We find that the purchase of the newspapers more likely than not was a purchase for Raymond's private collection, rather than a bulk purchase for the buyers group.  Petitioners have not shown that the newspapers were sold, and that the proceeds were deposited into their accounts during 1991 or 1992.  Therefore, the income for neither year is reduced by the cost of the newspapers.

m.  Thomas J. Bowers

The $1,260 check written to Thomas J. Bowers is for Desert Storm sets.  We find that the purchase of $1,260 worth of Desert Storm sets more likely than not was a bulk purchase for the buyers group, rather than for Raymond's private collection.  Therefore, the deduction for purchases for 1991 is increased by $1,260.

n.  Bob Kelly

Bob Kelly was paid $164 for wax.  We find that the $164 purchase of wax more likely than not was a purchase for Raymond's private collection, rather than a bulk purchase for the buyers group.  Petitioners have not shown that the wax was sold during 1991 or 1992.  Therefore, the cost of goods sold is not increased by the cost of the cards.

o.  Jim Wilson

Jim Wilson owns or works for a vending machine company.  Raymond purchased a $200 used video football game from Mr. Wilson for Morova's store.  Morova never paid Raymond for the game.  Raymond and Morova initially intended to operate the store as a partnership to which Raymond agreed to contribute video games.  The purchase of the game was not related to the bulk purchases for the buyers group.  Petitioners have failed to show that the cost of the video game is deductible in 1991 or 1992.

p.  Evelyn Johanson

Evelyn Johanson is the wife of a former security guard who worked at Cleveland Stadium.  Raymond wrote a check for $1,614 to Mrs. Johanson for her husband's collection of autographed baseballs.  Raymond claims that he purchased the baseballs for Dietz, that the baseballs went to Dietz's store Sports of Sorts, and that Raymond was repaid the $1,614 when they settled the Megacards deal.  Raymond did not call Dietz or Mrs. Johanson as a witness, and there is no other evidence to establish that the check was for the purchase of baseballs or that the baseballs went to Dietz.  Therefore, petitioners have failed to establish that the $1,614 is deductible in 1991 or 1992.

q.  Wholesale Club/Sam's Club

Wholesale Club (later became Sam's Club) distributed baseball cards.  Wholesale Club was able to obtain newly issued baseball cards 2 to 3 weeks before the tobacco and candy distributors.  Raymond claims that the $3,000 check payable to Wholesale Club, the $1,874.15 check payable to Sam's Club, and the $2,500 check payable to cash (with "Sam's Club" written on the memo portion of the check) were for cases of new baseball cards. Some of the checks in the record indicate the purpose of the check, e.g., some checks have "commons" written on the memo section of the check.  Unlike those checks, there is nothing noted on the checks written to Wholesale Club or to Sam's Club

that indicates that the money was used to purchase baseball cards. Petitioners have not established that it is more likely than not that these checks were used to purchase baseball cards for the buyers group, rather than for their personal living expenses. Therefore, petitioners have failed to establish that they are entitled to a deduction for the payments.

r. Cash

Barbara signed and endorsed a check drawn on the National City Bank account dated March 18, 1991, payable to cash in the amount of $1,600. She then gave the cash to Raymond. Raymond claims the $1,600 was used to purchase cards from a company that would only accept cash, because the buyers group had bounced some checks. There is no notation on the check or any other evidence in the record to indicate its purpose. Petitioners have not established that it is more likely than not that cash was used to purchase supplies for the buyers group, rather than for their personal living expenses. Therefore, petitioners have failed to establish that they are entitled to a deduction for the $1,600.

3. Unique Vinyl Transaction

Unique Vinyl makes binders. On March 13, 1991, Raymond wire transferred $5,270 from the National City Bank account to Unique Vinyl's bank account for purchases made during 1991. The bank charged a fee of $13.75 for the wire transfer. Also during 1991, a $3,156 check made payable to Unique Vinyl was written and paid

on the Ameritrust account. Respondent allowed a deduction for purchases in 1991 for the $3,156 check and the $5,270 wire transfer.

Raymond claims that on February 4, 1991, he transferred by wire $8,253.96 to Unique Vinyl from the Ameritrust account to pay for binders for the buyers group. Although the bank records show that a check in the amount of $8,253.96 was paid on February 4, 1991, petitioners did not provide any evidence establishing that Unique Vinyl was the payee of the check or that the payment was a wire transfer to Unique Vinyl. Petitioners did not provide a receipt, invoice, or otherwise establish that the payment represents a deductible expense.

## 4. Charge on Ameritrust Account

Jim Beckett publishes the Beckett Price Guides for baseball cards, basketball cards, hockey cards, and nonsport cards. He publishes an annual guide that sells for $20 and monthly updates that sell for $1. Raymond purchased large quantities of the price guides.

Respondent allowed a deduction in 1991 for checks made payable to Beckett or the buyers group totaling $4,166. Two of the checks, one dated April 5, 1991, and the other dated June 7, 1991, were each in the amount of $996. On February 20, 1991, the Ameritrust account was charged $996. Respondent did not allow a deduction for the $996 charge. Petitioners claim that the

account was charged $996 for another check to Beckett that had not been honored the first time it was presented to the bank. We find it more likely than not that the payment was to Beckett for the purchase of price guides for the buyers group. Respondent allowed petitioners a deduction for similar purchases made later in the year. We see no reasonable distinction between the earlier and later purchases. Therefore, the deduction for purchases in 1991 should be increased by $996.

5. Amounts Paid in 1991 and 1992 for Mr. Miller's Van

Petitioners also assert that they are entitled to deduct in 1991 the $1,400 purchase price of the van Raymond purchased for Mr. Miller. He purchased the van for Mr. Miller so that Mr. Miller could pick up and deliver the items Raymond's group purchased from Ohio Coin. The van was titled in Mr. Miller's name, and Mr. Miller was the owner of the vehicle. The vehicle experienced a transmission problem and Raymond paid $450 to Custom Trans, Inc., for the repair. He purchased the van for Mr. Miller and paid for the repair of the transmission in payment of Mr. Miller's services. Those services were related to the buyers group. Therefore, petitioners may deduct the $1,400 in 1991 and $450 in 1992.

6. Additional Checks Written in 1992 on the Ameritrust/Star Bank Account

Petitioners claim that the deductions for purchases and expenses should be increased for the following amounts paid from the Ameritrust/Star Bank account in 1992:

| Payee | Amount |
|---|---|
| Barbara Kling | $750 |
| CCPL[1] | 836 |
| John Banville | 600 |
| Eric Lawrence | 1,035 |
| Bill Clay | 1,228 |
| Raymond | 5,000 |
| Cash | 3,400 |

[1]Cuyahoga County Public Library.
[2]Repair of vehicle Raymond purchased from Cumba Motors in 1991.

The following discussion relates to the items listed above that were withdrawn from the Ameritrust and National City Bank accounts in 1991

a. Barbara

The $750 check written to Barbara was to repay her mother for a $750 loan that she made to Raymond. Petitioners argue that their income should be reduced to reflect the loan. Petitioners, however, have failed to show that the $750 Barbara's mother lent them was deposited into either the Ameritrust or National City account. There is no evidence that the $750 was included in respondent's determination of gross receipts. Petitioners have failed to establish that the gross receipts

should be reduced by the $750. Additionally, petitioners are not entitled to a deduction for repayment of the loan.

## b. C.C.P.L.

The $836 check to CCPL was for a shelving unit purchased at an auction by the Cuyahoga County Public Library for Morova's store. The purchase was not part of the bulk buying for the buyers group. Petitioners have failed to establish that the cost of the shelving unit is otherwise deductible in 1992.

## c. John Banville

John Banville works for the National Football League. The $600 check payable to John Banville is for the purchase of footballs and commemorative footballs from the Super Bowl. We find that the purchase of the footballs more likely than not was a purchase for Raymond's private collection, rather than a bulk purchase for the buyers group. Petitioners have not shown that the footballs were sold and that the proceeds were deposited into their accounts during 1991 or 1992. Therefore, petitioner's income for either year is not reduced by the cost of the footballs.

## d. Eric Lawrence

Eric Lawrence owns Lawrence Machines, a company that makes plastic sheets. Respondent included other payments to Lawrence Machines in the amount of purchases. We find that the $1,035 check written to Eric Lawrence more likely than not was a

purchase for the buyers group. Therefore, the cost of goods sold for 1992 should be increased by $1,035.

e. Bill Clay

Bill Clay owned Clay's Collectibles and manufactured baseball card boxes. We find that the $1,228 check written to Bill Clay more likely than not was a purchase for the buyers group. Therefore, the cost of goods sold for 1992 should be increased by $1,228.

f. Raymond

The $5,000 check to Raymond was a portion of his $18,000 profit from a picture deal that he reported on petitioner's 1991 return. Since the $5,000 was reported on the return, petitioners' omitted income is reduced by $5,000.

g. Cash

Three checks totaling $3,400 were made payable to cash. One check in the amount of $1,000 indicates that it was for Jim Mitchell of Ontario Hobby Dealers Supply of Canada. Another check in the amount of $1,600 indicates that it was for Ohio Coin. Respondent allowed deductions for other checks written to those payees. We find that these checks more likely than not were purchases for the buyers group. Therefore, the cost of goods sold for 1992 should be increased by $2,600.

The third check in the amount of $800 was for the purchase of pinball machines for Morova's store. The purchase was not

part of the bulk purchasing for the buyers group.  Petitioners have failed to establish that the cost of the pinball machine is deductible in 1992.

## 7.  Dishonored Checks

Of the $58,971 respondent allowed for purchases in 1992, checks totaling $18,130 were dishonored due to insufficient funds.  Petitioners concede that, in computing the amount of income for 1992, the amount of purchases allowed by respondent for 1992 should be reduced by $18,130.

## 8.  Star Account Miscellaneous Expenses

Respondent reduced gross receipts for 1991 and 1992 for all miscellaneous charges made against the Ameritrust account. Respondent did not reduce the gross income to reflect the $885.86 miscellaneous expenses from the Star Bank account.  Star Bank is the successor to Ameritrust.  The Star Bank account is the same account as the Ameritrust account.  We see no reason why the charges should be treated differently.  We find, therefore, the gross receipts for 1992 should be reduced by $885.86.

## F.  Conclusion

Rounding the amounts above to the nearest dollar, we find that petitioners are entitled to deduct additional purchases of $52,680 in 1991 and $10,313 in 1992 computed as follows:

Additional Purchases

| Item | Amount |
|------|-------:|
| 1991 | |
| Klein News | $24,049 |
| Jim Mitchell | 4,000 |
| Carl Dietz | 19,775 |
| Cash/Cirino | 1,200 |
| Bowers | 1,260 |
| Charge/Beckett | 996 |
| Miller van | 1,400 |
| Total | 52,680 |
| 1992 | |
| Miller van | 450 |
| Lawrence | 1,035 |
| Clay | 1,228 |
| Raymond | 5,000 |
| Cash/Mitchell | 1,000 |
| Cash/Ohio Coin | 1,600 |
| Total | 10,313 |

We find that, without regard to any adjustment for self-employment tax, petitioners omitted $32,350 from their income in 1991 and $34,932 in 1992 computed as follows:

1991

| | |
|------|-------:|
| Gross Receipts | |
| Notice of Deficiency | $455,584 |
| Less loans | (11,320) |
| Total | 444,264 |
| Purchases | |
| Notice of Deficiency | $353,234 |
| Additional | 52,680 |
| Total | 405,914 |
| Omitted Income | |
| Gross receipts | $444,264 |
| Purchases | (405,914) |
| Rent | (6,000) |
| Total | 32,350 |

1992

| | | |
|---|---|---|
| Gross receipts | | |
| Notice of Deficiency | $91,972 | |
| Star Bank miscellaneous | (886) | |
| Total | 91,086 | |
| Purchases | | |
| Notice of Deficiency | 58,971 | |
| Additional | 10,313 | |
| Dishonored checks | (18,130) | |
| Total | 51,154 | |
| Omitted Income | | |
| Gross receipts | 91,086 | |
| Purchases | (51,154) | |
| Rent | (5,000) | |
| Total | 34,932 | |

Issue 2.  Whether Petitioners Are Liable for Self-Employment Tax on the Net Income From the Sports Memorabilia Activity

Section 1401 imposes a tax on a taxpayer's self-employment income.  Self-employment income includes the net earnings from self-employment derived by an individual during the taxable year. See sec. 1402(b).  Net earnings from self-employment means the gross income derived by an individual from any trade or business carried on by the individual, less allowable deductions attributable to the trade or business, plus certain items not relevant here.  See sec. 1402(a).  With certain exceptions not here applicable, the term "trade or business" for purposes of the self-employment tax generally has the same meaning as used for purposes of section 162.  Sec. 1402(c).  Thus, to be engaged in a trade or business within the meaning of section 1402(a), an individual must be involved in an activity with continuity and regularity, and the primary purpose for engaging in the activity must be for income and profit.  See Commissioner v. Groetzinger,

480 U.S. 23, 30 (1987).

Raymond spent most of his time and effort during the years at issue on the buyers group activity. He had no intent to profit from that activity, as indicated by the fact that he distributed the products to the members of the group at cost.

Raymond collected sports memorabilia hoping the items would eventually appreciate in value. He sold only a few items from his massive collection and retained much more than he sold. In relation to his buying of memorabilia, his selling was sporadic. He continued to amass items for his collection (including hundreds of manual typewriters and tens of thousands of Cleveland Indian programs) without any plan to turn over items at any date in the foreseeable future and without any consideration of the cost effectiveness of paying rent to store the items.

After careful consideration of all the facts and circumstances, we find that Raymond's memorabilia activity does not rise to the level of a trade or business. See Sloan v. Commissioner, T.C. Memo. 1988-294, affd. without published opinion 806 F.2d 547 (4th Cir. 1990). Accordingly, Raymond did not have net earnings from self-employment during 1991 and 1992, and he is not liable for self-employment tax for those years.

Issue 3. Whether Petitioners Are Liable for the Accuracy-Related Penalty Under Section 6662(a)

Section 6662(a) and (b)(1) impose accuracy-related penalties equal to 20 percent of the portion of an underpayment that is

attributable to negligence or disregard of rules or regulations. Negligence is a "lack of due care or a failure to do what a reasonable person would do under the circumstances." Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992), affg. T.C. Memo. 1991-179. Negligence also includes any failure to make a reasonable attempt to comply with the provisions of the Code, exercise reasonable care in return preparation, keep proper books and records to properly substantiate items, or have a reasonable basis for a position taken. See sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs.

In determining whether petitioners were negligent in the preparation of their returns, we take into account their business experience. See Glenn v. Commissioner, T.C. Memo. 1995-399, affd. 103 F.3d 129 (6th Cir. 1996).

An exception to imposition of the negligence penalty is provided if it is shown that there was a reasonable cause for the understatement and the taxpayer acted in good faith. Petitioners bear the burden of proving that they are not liable for the penalty under section 6662(a). See Bixby v. Commissioner, 58 T.C. 757, 791 (1972).

Petitioners' primarily argue that, because Raymond "never believed he was involved in a trade or business", they are not liable for the accuracy-related penalty. To the contrary, Raymond did know that he bought, sold, and traded sports

memorabilia during the years at issue.  He made several sales of baseball cards during 1991 and 1992 the gains from which were not reported on petitioners' returns.  The fact that he may have used the proceeds to purchase other cards or memorabilia, does not exclude the gain from petitioners' income in the year of the sale.

Petitioners have offered no reasonable explanation for their failure to report all the income from Raymond's sports memorabilia activity.  Therefore, petitioners are liable for the accuracy-related penalty under section 6662(a).

Issue 4.  Whether Petitioner Barbara Kling Is Eligible for Relief Under Section 6015 With Respect to Any Understatement of Tax Attributable to the Sports Memorabilia Activity

In the petition, Barbara alleged that she was entitled to relief pursuant to section 6013(e).  Prior to the trial in this case, Congress enacted section 6015, and simultaneously repealed section 6013(e).[7]  Section 6015 provides three avenues of relief from joint and several liability:  (1) Section 6015(b)(1) (which is similar to former section 6013(e)) allows a spouse to escape completely joint and several liability; (2) section 6015(b)(2) and (c) allow a spouse to elect limited liability through relief from a portion of the understatement or deficiency; and (3) section 6015(f) confers upon the Secretary discretion to grant

_____

[7]Sec. 6015 generally applies to any liability for tax arising after July 22, 1998, and any liability for tax arising on or before July 22, 1998, that remains unpaid as of such date. See H. Conf. Rept. 105-599, at 251 (1998), 1998-3 C.B. 747, 1005.

equitable relief in situations where relief is unavailable under section 6015(b) or (c).  The parties have treated Barbara's claim pursuant to section 6013(e) as an election pursuant to section 6015(b)(1) and (2) and a request for equitable relief pursuant to section 6015(f) that respondent denied.  See Corson v. Commissioner, 114 T.C. 354, 364 (2000); Charlton v. Commissioner, 114 T.C. 333, 338-339 (2000); Butler v. Commissioner, 114 T.C. 276, 282-283 (2000).

We consider first whether Barbara is entitled to relief under section 6015(b)(1).

Section 6015(b)(1) provides:

> (1) In general.--Under procedures prescribed by the Secretary, if--
>
> (A) a joint return has been made for a taxable year;
>
> (B) on such return there is an understatement of tax attributable to erroneous items of one individual filing the joint return;
>
> (C) the other individual filing the joint return establishes that in signing the return he or she did not know, and had no reason to know, that there was such understatement;
>
> (D) taking into account all the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency in tax for such taxable year attributable to such understatement; and
>
> (E) the other individual elects (in such form as the Secretary may prescribe) the benefits of this subsection not later than the date which is 2 years after the date the Secretary has begun collection activities with respect to the

individual making the election,

then the other individual shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such understatement.

The requirements of section 6015(b)(1) are stated in the conjunctive; that is, a taxpayer must satisfy all of the requirements of subparagraphs (A) through (E) to be entitled to relief under section 6015(b)(1). There is no dispute in the instant case that Barbara satisfies the requirements of subparagraphs (A), (B), and (E). Respondent, however, contends that Barbara knew or had reason to know of the understatement and, therefore, fails to satisfy subparagraph (C). Respondent further contends that it would not be inequitable to hold Barbara liable for the deficiency, and therefore, she fails to satisfy subparagraph (D).

When the substantial understatement of tax liability is attributable to an omission of income from the joint return, the spouse's knowledge or reason to know of the underlying transaction which produced the omitted income is sufficient to preclude relief under section 6015(b)(1). See Cheshire v. Commissioner, 115 T.C. 183, 192 (2000). In the Cheshire case, the taxpayer knew of the entire amount of retirement distributions and interest earned, even though she did not know they were taxable.

Although Barbara knew that Raymond bought, sold, and traded

sports memorabilia, she had no actual knowledge nor reason to know that the activity produced omitted income.

In deciding whether a spouse "has reason to know" of an understatement, we recognize several factors that are relevant to our analysis, including: (1) The level of education of the spouse seeking relief; (2) the spouse's involvement in the family's business and financial affairs; (3) the presence of expenditures that appear lavish or unusual when compared to the family's past levels of income, standard of income, and spending patterns; and (4) the other spouses's evasiveness and deceit concerning the couple's finances.  See Butler v. Commissioner, supra.

As to the first factor, level of education, Barbara earned a college degree in teaching.  Although Barbara knew about Raymond's sports memorabilia activity, she was a full-time student and, generally, was not involved in the activity.

As to the second factor, involvement in the family's finances, the record does not clearly show who was responsible for maintaining the family checkbook.  Both Barbara and Raymond wrote some checks on the National City Bank account to pay the household bills.  Both had access to the National City bank statements mailed to petitioners' residence.  Barbara, however, did not have access to the Ameritrust account statements that were delivered to Morova'a store and then taken by Morova to the warehouse.

As to the third factor, unusual or lavish expenditures, the record demonstrates that the family did not enjoy a high standard of living during the years at issue. Indeed, the cash they had accumulated was consumed. Barbara paid for her college tuition with a student loan and maximized her credit card. She and Raymond lived in the same house for more than 21 years; they bought only inexpensive used cars; they refinanced their house, and their children paid for their own educations. Most of Raymond's income was applied toward acquiring collectibles; only a small portion was spent for the benefit of the family. There is no evidence in the record indicating any expenditures out of the ordinary when compared to petitioners' spending habits in prior years.

As to the fourth factor, there is no evidence that Raymond ever attempted to hide any of his income or assets from Barbara.

Barbara was aware that Raymond was depositing substantial amounts of money into their personal checking account, she knew of her husband's sports memorabilia activities and that he often dealt in cash during the years in issue. Barbara, however, had no knowledge or reason to know that his net income from those activities during those years exceeded the amounts reported on the returns.

We reject the importance that respondent places on Barbara's access to the National City Bank account. Checks written on that

account and the Ameritrust account were frequently dishonored due to insufficient funds.  This would have caused a reasonable person to believe that Raymond's activities were losing money. It is unlikely that an examination of the statements would have alerted Barbara that any income was omitted.

Although we recognize that there may have been a disparity between the family's total expenditures and their reported income for the years 1991 and 1992, this does not necessarily indicate that Barbara should have known of the omitted income.  The record clearly shows that the omitted funds were used primarily to purchase Raymond's memorabilia.  The relatively small amount used to help support the family was spent primarily for groceries, house payments, bills, and other minor living expenses. Moreover, petitioners borrowed against their credit cards to pay the expenses.  These expenditures were in the nature of ordinary support and would not normally give a spouse reason to know of omitted income.  See Mysse v. Commissioner, 57 T.C. 680, 698-699 (1972).  There is no evidence of any lavish or extraordinary expenditures which would have put Barbara on notice of unreported income.  Cf. Estate of Jackson v. Commissioner, 72 T.C. 356, 361 (1979); Mysse v. Commissioner, supra.

We conclude, from our examination of the evidence presented, that there was no reason for Barbara to have known that there was income from Raymond's sports memorabilia activity that was not

reported on petitioners' 1991 and 1992 tax returns. Therefore, she satisfies the requirement of section 6015(b)(1)(C). Cf., Cheshire v. Commissioner, 115 T.C. at 192-193; Charlton v. Commissioner, 114 T.C. at 340.

We must next decide whether Barbara satisfies section 6015(b)(1)(D). Section 6015(b)(1)(D) requires a determination of whether, taking into account all other facts and circumstances, it is inequitable to hold Barbara liable for the tax. A determination under this provision of the statute is essentially factual.

The term "inequitable", as defined in section 1.6013-5(b), Income Tax Regs., is as follows:

> Whether it is inequitable to hold a person liable for the deficiency in tax * * * is to be determined on the basis of all the facts and circumstances. In making such a determination a factor to be considered is whether the person seeking relief significantly benefited, directly or indirectly, from the items omitted from gross income. However, normal support is not a significant "benefit" for purposes of this determination. * * * Other factors which may also be taken into account, if the situation warrants, include the fact that the person seeking relief has been deserted by his spouse or the fact that he has been divorced or separated from such spouse.

In the instant case, Raymond used the money from his sports memorabilia activity primarily to purchase more collectibles. He did use some of the money for groceries, bills, and other items of ordinary support for the family. The use of omitted income for ordinary support of the family does not constitute a

significant benefit for purposes of section 6015(b)(1)(D). See Mysse v. Commissioner, supra at 698; see also sec. 1.6013-5(b), Income Tax Regs. Additionally, Barbara's joint property right in the National City account does not constitute a significant benefit. See Dakil v. United States, 496 F.2d 431 (10th Cir. 1974). Barbara actually withdrew only amounts for items constituting ordinary support.

Barbara did not significantly benefit from the omitted income. See Butler v. Commissioner, 114 T.C. at 291. Barbara paid for her college tuition with a student loan and maximized her credit card. She and Raymond lived in the same house for more than 21 years; they bought only inexpensive used cars; they refinanced their house, and their children paid for their own educations. Barbara's lifestyle did not change on account of the receipt of the omitted income. There were no unusual transfers of property to Barbara during either the years at issue. If anything, Raymond's activity may have worked to Barbara's detriment.

Taking into account all the facts and circumstances, we find it would be inequitable to hold Barbara liable for the deficiency in tax. See Dakil v. United States, supra; Mysse v. Commissioner, supra.

Therefore, we find that Barbara qualifies for relief under section 6015(b)(1) with respect to the understatement of tax

(including penalty and interest) attributable to Raymond's sports memorabilia activity for taxable years 1991 and 1992.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.